IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 15, 2011 Session

IN RE A'MARI B.

Appeal from the Juvenile Court for Hawkins County
No. HJ-09-0529      James F. Taylor, Judge

No. E2010-01789-COA-R3-PT-FILED-AUGUST 31, 2011

This is termination of parental rights case involving A'Mari B. ("the Child"), the minor daughter of Troy B. ("Father") and Rebecca S. ("Mother"). The Department of Children's Services ("DCS") took the Child as an infant into state custody after both Father and Mother were arrested and jailed. The Child was promptly placed with Christopher N. and Dean N. (collectively, "the Custodians"), the prospective adoptive parents, where she has remained. Five months after obtaining legal custody, the Custodians filed a petition to terminate the parental rights of Father and Mother in order to facilitate their adoption of the Child. Following a bench trial, at which Mother appeared, the court terminated both natural parents' rights to the Child based on the court's finding of multiple forms of abandonment. Over Father's objection, his case was tried without his presence or participation. Father and Mother, by separate notices of appeal, challenge the termination order. As to Father, the judgment is vacated and the case remanded for a new trial – our action being based on the fact that Father was denied due process in the termination proceeding. As to Mother, the evidence does not preponderate against the trial court's finding that there is clear and convincing evidence that she abandoned the Child and that termination of her rights is in the Child's best interest. Accordingly, as to Mother, the judgment is affirmed

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part and Vacated in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

William E. Phillips II, Rogersville, Tennessee, for the appellant, Troy B.

John S. Anderson, Rogersville, Tennessee (appeal), and Gerald T. Eidson, Rogersville, Tennessee (trial), for the appellant, Rebecca S.

Douglas T. Jenkins, Rogersville, Tennessee, for the appellees, Christopher N. and Dean N.

## OPINION

### I.

This matter was heard by the trial court on July 15, 2010. The evidence reflects the following. The Child was born in Virginia on July 31, 2007. Father and Mother were never married to each other. Both are married to others. When the Child was born, the parents lived in different states – Father in Tennessee, and Mother in Virginia.[1] In early September 2007, Mother traveled to Tennessee with the Child – who was then four weeks old – to visit Father and a niece of Mother's. While the record provides few details, Mother's testimony indicates that during her visit, she and the Child were present when Father and others were arrested for breaking into a store that sold guns; there were other related charges as well. Both Father and Mother apparently were convicted of felony offenses related to their roles in the incident; both were incarcerated.[2] DCS took custody of the Child and, in September 2007, placed her physical custody with the Custodians, with whom she continued to live at the time of trial.

The Guardians are the natural parents of two grown children; they also serve as foster parents. At the time of trial, they were raising the Child and two foster children in their Rogersville home. Christopher is employed; Dean is a stay-at-home mother. Dean testified that the Child was a member of the family and the Custodians desired to make the arrangement permanent by adopting her.

Mother served nine and a half months of her sentence before she was released in May 2008. Upon her release, Mother returned to Virginia to live with a friend. She was soon reunited with her five other children and moved several more times, staying with different friends or in homeless shelters, until she was able to secure an apartment – and finally a home – to accommodate her family. At the time of trial, she asserted she had recently been employed to clean houses, but had not yet started. She and her children relied for support on

---

[1]Mother testified that she remains married to her husband of 17 years, but they have been separated for the past five years.

[2]No criminal court judgments are in the record. In a handwritten letter to the trial court clerk dated March 2010, Father asserted that he would complete service of his sentence in the state of Virginia in April 2010 and would then begin serving a 51-month sentence in federal prison. In her testimony, Mother stated she received a suspended sentence of 14 years and was released on 2 years' probation.

help from her estranged husband – the father of three of her children – as well as her oldest son's social security disability benefits, and state assistance. Mother had no car and her driver's license was suspended as a result of unpaid court costs related to her criminal case. As a result, she relied mainly on the local bus system for transportation.

Mother acknowledged that the Custodians were "the only family that [the Child] knows" and asserted that she was not out to hurt anyone, but only wanted some parental rights. She observed, "she's my child, too." Mother testified that, following her release from confinement in May 2008, she visited the Child four or five times, but conceded that she had no visits in the four-month period immediately preceding the filing of the petition to terminate her rights. Mother contended that she was either not allowed or unable to visit once the Custodians obtained legal custody of the Child in December 2008. Dean acknowledged that Mother had called to arrange visits – five times in the relevant four months – but stated that no visits took place because Mother failed to show up for the scheduled visits. Dean denied that she or her husband ever refused to accept or failed to return Mother's calls. Both Mother and Dean stated that Mother had never paid any child support. At trial, Mother's testimony was equivocal as to whether she was aware of a December 2008 juvenile court order setting her child support obligation at $116 a month.[3]

At the conclusion of the trial, Mother insisted that she knew what she needed to do with respect to the Child: "I know I gotta get myself together. I gotta make sure I'm trying to get my daughter back."

The court terminated both parents' rights based upon its finding of multiple forms of statutory abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(2010). Specifically, the court found, by clear and convincing evidence, that Father had engaged in criminal conduct evincing a wanton disregard for the Child's welfare and that both Father and Mother had failed to visit or support the Child during the four-month period immediately preceding the filing of the termination petition. The trial court also found that there is clear and convincing evidence that termination is in the Child's best interest.

Father and Mother, represented by separate counsel, each timely filed a notice of appeal. They have filed separate briefs.

II.

Mother raises one issue for our review:

---

[3]No order for child support is included in the record before us.

1. The evidence at trial does not clearly and convincingly establish that Mother abandoned the Child.

Father raises additional issues that we restate as follows:

1. Did the trial court err in denying Father's motion to continue and proceeding to trial in his absence?

2. Did the evidence at trial clearly and convincingly support the trial court's conclusion that Father willfully abandoned the Child?

III.

We employ the following standard of review in cases involving the termination of parental rights:

[T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness that we must honor unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is given to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon a finding of at least one statutory ground. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c)(Supp. 2007); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence.

*See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed Aug. 13, 2003); it eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

A.

The nature of Mother's challenge to the trial court's finding that she abandoned the Child is not entirely clear. As previously noted, the trial court expressly found that Mother "abandoned the [C]hild by willfully failing to support or visit during those four months immediately [preceding] filing [of] the petition." In response, Mother inexplicably refers to that portion of Section 36-1-102 which applies to incarcerated parents and devotes much of her argument to her contention that her conduct did not exhibit a wanton disregard for the Child's welfare.

As relevant to Mother's argument, this Court has explained:

> The "wanton disregard" language actually appears in Tenn. Code Ann. § 36-1-102(1)(A)(iv) as one of the alternative definitions of abandonment as a ground for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g)(1) (incorporating the definitions of abandonment found in Tenn. Code Ann. § 36-1-102 as a ground for termination). The statutory provision applies to a parent who was incarcerated during all or part of the four months immediately preceding the filing of the petition to terminate that parent's rights and who "has engaged in conduct prior to incarceration that exhibits wanton disregard for the welfare of the child."

As we noted earlier in this opinion, the trial court found this species of abandonment existed with respect to Father, but not Mother. While Mother was incarcerated at one point, she was released in May 2008, a full year before the termination was pursued. As can be seen, that portion of the statute defining abandonment based on the "wanton disregard" language is inapplicable to Mother.

B.

Mother briefly addresses the trial court's finding that she abandoned the Child by failing to visit her in the four months immediately preceding the filing of the petition. Mother baldly asserts that, by their "willful and intentional acts," the Custodians prevented her from visiting the Child. Significantly, Mother does not contest, or even address, the court's additional finding that she also abandoned the Child by failing to provide child support.

At trial, Mother was questioned by her counsel regarding her efforts at visitation:

Q: [P]articularly from January of 2009 to May of 2009, do you recall how many times you've called the [Custodians'] home and no one answered?

A: Quite a few. I can't remember. I said I do have some documents I've been keeping – but I did forget my paperwork – but quite a few times I've called. I've even called and spoke to [Dean's] husband when she wasn't there.

* * *

Q: Would you leave messages when you called and there would be no answer, . . .

A: Yes.

* * *

Q: Prior to that [February 2010] [visit], how . . . long did you go without visiting [the Child]?

A: It had been a while.

Q: Okay. Would you consider that to be your fault?

A: No. Because every time I would call, . . . she told me I couldn't because I didn't never have – I needed to get a hair sample done. I have been calling since December [2008], when she got custody of [the Child], asking when can I come visit,

-6-

and she tells me I cannot come and visit until I get a hair sample
– that it was Court ordered.  I never seen (sic) that Court Order.

* * *

Q: [Dean] testified that in January of 2009 you called her and set up a visit for January 30th of 2009.  Do you recall that?

A: No.

Q: Okay.  Do you . . . recall any visits that were set up from January 2009 until May of 2009?

A: No.

Dean testified at trial that Mother failed to exercise any visitation in the relevant four months from January to May of 2009.  Referring to a log Dean had maintained, she noted that Mother contacted her in January 2009 and requested to visit the Child on January 30th, to which Dean agreed.  Mother did not show up and Dean "never heard from her again for three months."  Dean stated Mother contacted her again in April 2009, they agreed to a visit that month, and, again, Mother was "a no-show" and did not contact Dean again for another month.  Mother next arranged to visit in February 2010, after the petition was long-pending, and she later cancelled that visit.  Dean testified that Mother had called her, in all, five times in the four months immediately before the petition was filed; Dean spoke to  Mother each time and visits were planned, but none took place.  In 2010, which, as previously noted, was long after the petition was filed, Mother began to visit the Child again.

In summary, the evidence shows Mother visited the Child four or five times before the Custodians obtained legal custody in December 2008.  Thereafter, she made several phone calls to the Custodians, but did not visit in the critical four-month period.  Mother did not again actively pursue visitation until February 2010.  Mother's own testimony corroborates the Custodians' assertion that she made no attempt to arrange visits in the pertinent four-month period.  Moreover, Dean denied that she ever failed to return Mother's calls or refused to allow Mother to visit.  The trial court obviously credited Dean's testimony in this regard.  Lastly, regarding visitation, Mother testified that, with the exception of a friend who once drove her, she simply had no means of getting to Tennessee to be with the Child; Mother had been unemployed, had no car, her driver's license was suspended as a result of unpaid court costs in her criminal case, and she was responsible for taking care of her other children.  Asked why, upon her release in 2008, she chose to return to Virginia,

rather than Tennessee where the Child was living, Mother said that she did not know anyone in Tennessee that could help her.

We turn now to the ground of abandonment by non-support. At trial, Mother conceded that she had "never paid one dime" of child support. According to Mother, she was able-bodied and had been looking for a job since her release, but remained unemployed until the time of trial. At the same time, Mother contended that all her children had what they needed. She noted she had bought the Child some presents and sent her cards on her birthday and at Christmas. Mother denied knowledge of an obligation to pay a set amount of child support, but continued: "No. Other than a paper that I got through the Courts, and I had . . . to order that myself to get it. I never signed any papers saying I owe . . ."

In its bench ruling, the trial court noted that "[M]other readily admits that she has not paid any type of child support." Further, there was undisputed evidence that Mother had no visits with the Child in the critical four-month period immediately preceding the filing of the termination petition. At trial, Mother emphasized that she "knew what she needed to do" to be reunited with the Child. It is clear, however, that she failed to take the appropriate steps in a timely manner.

The evidence does not preponderate against the trial court's finding of clear and convincing evidence showing that Mother abandoned the Child by intentionally failing to visit and by intentionally failing to provide child support.

C.

A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the best interest of the child. Tenn.Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn.2003); *In re Valentine*, 79 S.W.3d at 546. In the present case, the trial court stated its best-interest analysis as follows:

> [T]his [C]hild knows [the Custodians'] family as [her] family, . . . and photographs . . . depict the [C]hild in just that exact family type setting. Relative to determination of the [C]hild's best interest, the Court does conclude, then, that neither parent has maintained a regular visitation or contact with the [C]hild; that neither parent has established a meaningful relationship with the [C]hild . . . ; that being that this [C]hild knows the [Custodians] as [her] family – not just a family – that [she] could be bonded with or be a part of, but this is the [C]hild's

family. [T]he Court then, therefore, concludes that it would be a negative impact on the [C]hild's emotional and psychological well-being to have [a] . . . change of caretakers and physical environment at this time. The Court finds that neither parent has paid child support consistent with the Child Support Guidelines . . . , and therefore the Court does conclude, as a matter of law, that it is in the [C]hild's best interest for the termination of the parental rights of both parents to occur to this [C]hild.

Mother does not challenge the trial court's best interest determination. In the interest of justice, we have nevertheless reviewed the record and are satisfied that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that termination of Mother's rights is in the best interest of the Child.

V.

We turn to Father's assertion that the trial court erred in denying his motion to continue the trial after he became unavailable to participate. We quote extensively from the trial transcript to reflect the circumstances underlying this issue:

The Court: [Father] is not present and is in custody of the United States government, but Mr. William Phillips – his Court Appointed Attorney – is here, and [he has] made arrangements – with the authorities to have him participate and to be available by telephone-conference, and I think our case was scheduled for 1:00 and it's 2:30 p.m. now, and they might have got tired of waiting. Is that the sum of it?

Mr. Phillips: Yes. They have . . . said that most emphatically.

*   *   *

The Court: All right. Mr. Phillips, tell us about the arrangements that you made for [Father] to participate in the Hearing today and then the difficulties that you've experienced today in . . . that.

Mr. Phillips: Yes, Your Honor. [W]ell, we had attempted to contact [Father's] . . . Counselor – which is a Paul Dunston, Your Honor – and had repeatedly made phone calls to him – at

-9-

least five – and had never heard back from his Counselor, after leaving a message every time. Finally I sent a letter to . . . the Federal Correctional Institute in Virginia – and only . . . less than a week ago did I get a call from his Counselor stating that he would have him available to participate via teleconference today. [M]y letter makes them aware . . . of the nature of the proceedings. I called him . . . about 1:10 today – and he had [Father] in his office ready to participate, and he was rather caustic about that, however, . . . noting that we would be paying his overtime and that – I advised him, well, he could certainly take that up with the Judge, and he said to tell the Judge that, "He's on my time now." Anyway, I told them that we would get to them in twenty or thirty minutes. While Your Honor was conducting another Hearing. I got a phone call from my office that indicated that this Counselor was on the other line, and that he was leaving, and I told my secretary to inform him that this was a termination of [Father's] parental rights – that his participation was absolutely necessary and approved by the Court, and he said that . . . he didn't care – and that we should have had him transported here. Of course, Your Honor well knows . . . that Federal Courts have never . . . transported anyone for a Termination Hearing.

The Court: We're basically ignored. We're not told, "No."

\* \* \*

Mr. Phillips: Exactly.

\* \* \*

The record reflects that at this juncture, the trial court instructed Mr. Phillips to contact Father's prison counselor again regarding Father's participation in the hearing. After informing the operator at the federal prison of the nature of his call, and being placed on "hold" for some 11 minutes, the operator returned to advise that "Counselor Dunston is not available right now." When Father's attorney moved to continue the hearing, the following dialogue occurred:

Mr. Phillips: Obviously his Counselor at the Correctional Institute didn't feel that [Father's participation] was necessary,

-10-

and unilaterally terminated our scheduled conference call. That being the case, Your Honor, and [Father] not being present, we'd have no choice but to ask for a Continuance . . . .

The Court: All right. The Motion for a Continuance is denied. Mr. Phillips, you've done everything that could have been reasonably expected of you and your zealous representation of [Father]. You went above and beyond the call of any obligation that an attorney would have in this circumstance. You've made numerous attempts to telephone the facility . . . . You were experiencing and recited problem in contacting this Counselor . . . you went ahead and advised him of the date of the Hearing and the time, and that . . . the person in their custody had the right to participate. [. . . .] We have afforded [F]ather his right to a meaningful participation in this Hearing as contemplated by Tennessee Law. To no fault of the [Custodians], this Court, or yourself, [Father] . . . has not been afforded that right, and it appears at this time – based upon the telephone call and the representations that you have made here today – that it is, in fact . . . the government that's not affording him this right, and we have done everything we can to accommodate that. So the Hearing will proceed.

Father asserts that he has a fundamental due process right, as well as a statutory right, to meaningful participation in a hearing to terminate his parental rights, and contends that the denial of a continuance in light of his unavailability – through no fault of his own – was error. We agree on both counts.

There can be no question that a proceeding to terminate one's parental rights implicates the fundamental right of parents to the care, custody, and control of their children so that due process protections apply. Thus, this Court has held that "where a fundamental right such as . . . parental rights is at stake, due process requires the trial court to provide the prisoner defendant with meaningful access to the court and an opportunity to be heard." ***In re Jo'Nise Yo'Vee Perry***, No. W2000-00209-COA-R3-CV, 2001 WL 277988, at *5 (Tenn. Ct. App. W.S., filed Mar. 12, 2001). To this end, Tennessee law provides an incarcerated defendant with an opportunity to participate in a termination hearing. Specifically, pursuant to Tenn. Code Ann. § 36-1-113(f)(3)(2010), "the incarcerated parent or guardian has the right to participate in the hearing and contest the allegation that the rights of the incarcerated parent or guardian should be terminated, and, at the discretion of the court, such participation

-11-

may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be appropriate under the circumstances. . . ."

In the present case, Father does not contest the means of his intended participation. Indeed, we have held that "[i]f a prisoner's access to the court is meaningful – and telephonic access has been deemed to be meaningful – the requirements of due process are satisfied. . . ." Father argues that because, through no fault of his own or anyone present at the hearing, he was not allowed the opportunity to participate in his own defense by any means, his due process rights were not satisfied. Father is correct.

We have held, under similar facts, that the trial court erred in proceeding with a termination hearing in the absence of the incarcerated defendant father on the first day of the proceeding after his counsel was unable to locate him in the prison system. *See **State Dep't of Children's Servs. v. Williams,*** No. W2008-02001-COA-R3-PT, 2009 WL 2226116, at *4 (Tenn. Ct. App. W.S., filed Jul. 28, 2009).

The delayed start of the hearing aside, we are certainly sympathetic to the difficulties, even outright opposition, that Father's counsel apparently encountered in his persistent efforts to arrange Father's participation in the hearing. Similarly, it appears that the trial court had earlier experienced similar problems in securing the participation of inmates in termination hearings in its courtroom and felt it was left with no choice but to continue the proceedings without Father. In the end, however, the trial court itself acknowledged that Father was not, in fact, afforded his right of access and meaningful participation, but nevertheless elected to proceed without him. This court reviews a trial court's decision to deny a motion for a continuance under the abuse of discretion standard of review. ***State Dep't of Children's Servs. v. V.N.***, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008). In this case, we conclude that Father's right to due process was violated when the trial court denied his motion to continue and when it proceeded with the trial in his absence. Accordingly, we conclude that the trial court abused its discretion when it denied Father's motion to continue.[4]

VI.

Father further contends that the trial court erred in finding that he abandoned the Child by failing to visit or support the Child in the four-month period immediately preceding the filing of the termination petition, and by engaging in conduct that exhibited a wanton disregard for her welfare. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). As discussed above,

---

[4]While the trial court certainly has the prerogative as to how it proceeds with the various cases set for trial/hearing on a given day, it might be wise to set Father's trial at a specific time, *e.g.*, at the start of the docket, so as to correspond to the time set with the federal authorities for Father's availability.

we have concluded, that the trial court erred in proceeding to trial in Father's case. In view of our judgment remanding Father's case for a new trial, we find it unnecessary and inappropriate to address Father's substantive challenges to the trial court's termination order.

## VII.

The judgment of the trial court is affirmed in part and vacated in part. As to the appellant Rebecca S., the judgment is affirmed. As to the appellant Troy B., the trial court's judgment is vacated and this matter is remanded to the trial court for a new trial as to the Custodians suit against Troy B. Costs on appeal are taxed 50% to Mother, Rebecca S. and 50% to the Custodians, Christopher N. and Dean N.

_____
CHARLES D. SUSANO, JR., JUDGE