IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 18, 2013 Session

# IN RE KAYLA N.A. ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 181378-3      Michael W. Moyers, Chancellor**

**No. E2012-02662-COA-R3-PT-FILED-OCTOBER 31, 2013**

Megan A.A. ("Mother") appeals the termination of her rights to her children, Kayla N.A. and Haylei M.A. ("the Children").[1]    The Department of Children's Services filed a petition alleging that the Children were dependent and neglected as a result of both parents' drug abuse.  On the same day, the juvenile court entered an ex parte order awarding temporary custody of the Children to Teresa W., the Children's paternal grandmother ("Grandmother").  After later entering an agreed order that adjudicated the Children as dependent and neglected, the court awarded temporary legal and physical custody to Grandmother.  More than a year after the Children came into her custody, Grandmother filed a petition in the trial court to terminate Mother's parental rights.  Following a bench trial, the court granted the petition based on its finding that Mother abandoned the Children by willfully failing to visit and support them.  The court further found that termination of Mother's rights is in the Children's best interest.  The court stated that it made both findings by clear and convincing evidence. Mother appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Megan A. A.

Wayne D. Wykoff, Knoxville, Tennessee, for the appellee, Teresa W.

---

[1]The parental rights of the Children's biological father, Bradley J.A., were terminated by default judgment.  No appeal was taken as to this action of the trial court.  We refer to him only as is necessary to recite the facts relevant to Mother's case.

# OPINION

## I.

Grandmother filed her petition to terminate Mother's rights on September 27, 2011. When the bench trial began in October 2012, Kayla was four and Haylei was nearly three. The Children had been in Grandmother's custody continuously for more than two years. Mother and the biological father, Bradley J.A. ("Father"), were then in the midst of a divorce proceeding.

Mother, then 22, married Father on September 15, 2008, a month after their first child, Kayla, was born. Soon after Kayla's birth, Father began abusing prescription pain medications, while Mother continued her years-long marijuana habit. She testified she stopped using marijuana after she learned she was pregnant with Haylei. Hospital records reflect that Mother had a negative drug screen at the time of Haylei's birth in December 2009. Soon after the child was born, however, Mother "fell into" the same pain pill addiction as Father. Mother testified that they financed their drug habits with Father's income from working odd jobs and money Grandmother gave them before she became aware of their drug problems.

On August 11, 2010, at Mother's request, Grandmother picked up Kayla, then two, at the home of the child's maternal grandmother. Mother conceded she was at home, "probably . . . doing pills at the time." Upon her arrival, Grandmother discovered that Kayla was sick with a fever. Grandmother took the child to the emergency room where she was admitted with a fever of over 106 degrees. Hours later, Mother arrived and reported that, for more than a month, she had not administered an antibiotic that Kayla had been prescribed for a chronic kidney infection. In her defense, Mother testified that her grandmother, a nurse, had advised her not to give the child the prescribed medication because it would "crystallize" her kidneys over time. Grandmother remained at Kayla's side as she remained hospitalized for the next week. During that time, Father, for the first time, informed Grandmother that he and Mother were addicted to pain pills, mainly hydrocodone. When Kayla was discharged, she joined her sister at Grandmother's home, where the Children have lived with Grandmother and her husband, Jim,[2] ever since.

The Children's situation was referred to DCS. On August 27, 2010, DCS visited the parents' home and later obtained an ex parte order formally granting temporary custody of the Children to Grandmother. Mother admitted that, on the occasion of DCS's visit, she

---

[2]Jim is not the biological grandfather of the Children.

tested positive for "marijuana, benzos, cocaine, and Oxys." She testified that earlier that day, she had used cocaine for the first time.

Initially, Grandmother agreed to care for the Children and to supervise the parents' visits with the Children in order to give Mother and Father a chance to resolve their drug problems and "do the right thing." Grandmother testified that she agreed to bring the Children to the parents' home because they did not have money for gas to come to her home. At times, visits were cut short because Mother and Father "were obviously high." In December 2010, the court entered an agreed final order adjudicating the Children dependent and neglected in Mother's custody. That same month, Mother began an intensive outpatient drug program at Helen Ross McNabb Center in Knoxville. She failed every drug screen she was given and was dismissed from the program. Mother testified she had been diagnosed as being bi-polar, and once admitted herself to a hospital because she "felt like hurting myself or somebody else. . . ." In May 2011, the court, on Grandmother's motion, amended the visitation order to provide that visits would henceforth take place at Parent Place in Knoxville under the supervision of its staff.

In June 2011, Mother moved to Dayton, Ohio. At trial, Mother explained that she moved there because she could not stop abusing drugs while living with Father, who had no interest in quitting. Mother said that other than her mother, who was a lifelong drug addict herself, she had no other family in Tennessee. Mother said she intended to rely on her extended family in Dayton for help. In later testimony, Mother acknowledged that, in a pro se, handwritten "answer," she initially stated that the reason she moved to Ohio was because her grandmother there was very ill. Mother explained that this was true, but, once there, she realized it was an environment in which she could stop her drug abuse, so she decided to stay. Mother conceded that once in Ohio, she smoked marijuana with a cousin every day for the first month. She explained she used marijuana to help ease her withdrawal from the pain pills. She testified she quit her pill addiction on her own and "it was very hard." Mother agreed she left Knoxville knowing that visiting the Children some six hours away would be difficult, but felt it was more important to focus on getting "clean." Within weeks, however, Father also came to Ohio. He moved in with Mother and her cousin and he and Mother resumed abusing pain pills.

At the end of June 2011, Mother left Father and moved out of her cousin's home. In July, Mother met her new boyfriend, D.H., and moved in with him.[3] Mother and D.H., a single parent, met at "Riders," a social "club" frequented by motorcycle riders. Mother conceded there was drinking, but testified it was not a problem to bring children because

_____

[3]The final termination decree, filed on April 5, 2013, nunc pro tunc to November 4, 2012, states as a post-judgment fact that D.H. "is now deceased, having taken his own life."

"nobody gets drunk . . ., not when there's children there." D.H. supported Mother and she became his young son's primary caregiver. The "family" also received food stamps. D.H. admitted to a "very long criminal history of arrests." Most recently, he was arrested in 2012 for disorderly conduct outside a bar where he and Mother got drunk.

In October 2011, Mother completed an intake appointment at Parent Place and began visiting the Children. She described the visits as "great." She said the Children welcomed her, were excited to play with her, and were reluctant to leave at the end of each visit. She agreed that she missed scheduled visits in 2012 during February, June, July and August. Further, the center was closed during December 2011 and May 2012 for holidays. Mother admitted that on some occasions she was late and the Children left before she arrived.

In Ohio, Mother stayed home to care for D.H.'s son. From November 2011 until January 2012, she accepted seasonal employment at a Victoria's Secret call center. She testified she was not kept on after the holidays, but planned to apply at other call centers for a permanent position. She also planned to apply for financial aid to attend school to become a dental hygienist. Mother testified she did not want to depend on public assistance and was willing to "work three jobs" if she had to as long as they were not fast food jobs. She explained she worked in fast food restaurants for years as a teenager and for several months after Kayla was born, and was not interested in such work anymore. Mother acknowledged that, in her deposition, she had agreed that she basically lived off of others.

In other testimony, Mother conceded that she had lied in discovery when she denied an "ongoing" drug habit. On questioning by the court, Mother admitted that her continuing use of marijuana would be considered an "ongoing drug habit," but said she did not abuse marijuana and did not consider it to be a problem – in her view, it was not a drug. Mother testified that she stopped her marijuana use for a year, from August 2011 until August 2012 in an effort to get her children back, but "broke down" and smoked two months before trial. Mother told the court she did not plan to resume using marijuana every day if she regained custody of the Children, but conceded she would smoke "[m]aybe once in a while when they're not around."

At the time of trial, Grandmother, a commercial banker for some 30 years, had returned to work in order to provide insurance benefits for the Children. She and Jim, a recently retired detective with the Knox County Sheriff's Office, had put their retirement plans on hold. They leased a house with more room and a yard for the Children. Mother continued to live in Ohio with D.H. She testified she was enrolled in a drug treatment program, but had not completed it. Mother's drug counselor testified that the treatment program involved twice-weekly group sessions and random drug screens. In addition, clients met with him individually once a month. Mother had had no individual sessions because of

-4-

her sporadic attendance at the group sessions.  Mother attended the program a total of seven times between May 2012 and August 2012.  After passing a drug screen in August, she had not returned to the program or returned calls from her counselor.  Mother was eligible to stay in the program but, because of her extended absences, would have to start over.

Following the termination hearing, the court ordered Mother's rights terminated.  The court expressly concluded that clear and convincing evidence showed that Mother "abandoned her minor children for the 120 day period set forth at TCA § [36-1-113](g)(1) and TCA § 36-1-102."  On further considering the best interest of the Children, the trial court found that all but one statutory factor weighed in favor of termination.  The court "regretfully conclude[d] that clear and convincing evidence has been presented . . . that justifies and requires termination of [Mother's] parent rights. . . ."  Mother filed a timely notice of appeal.

## II.

### A.

Mother raises the following issue as taken verbatim from her brief:

> Whether the trial court erred in terminating [Mother's] parental rights where her failure to visit or support was not willful.

### B.

On appeal, as an additional "issue," Grandmother "seeks a finding that at least one (1) *additional* ground for termination exists in this case."  (Emphasis added).  To this end, Grandmother asserts as additional grounds Mother's substantial noncompliance with the permanency plan, severe child abuse,[4] and the persistence of the conditions that led to the Children's removal.  On our review of the entire record, we observe that these additional grounds were not specifically pleaded.  We therefore limit our review to the grounds pleaded.[5]

---

[4]In her amended complaint, Grandmother did allege severe child abuse and specifically alluded to the fact that Mother "used drugs while pregnant with one or both of the children."  In this appeal, she relies upon abuse in that Mother failed to give a child "appropriate medical care."  This latter charge of abuse was never alleged.

[5]As can be seen, Mother does not challenge the trial court's "best interest" determination.

III.

This Court's duty is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence. ***In re F.R.R., III,*** 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. ***Id***.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See **Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. ***Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); In re Drinnon***, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon sufficient proof of appropriate statutory grounds. *See **Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002). Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, ***State v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. ***In re Valentine***, 79 S.W.3d at 546; ***In re S.M.***, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

Mother challenges the trial court's finding that she abandoned the Children by failing to visit or support them. The gist of her argument is that her lack of action was not willful.

We address the statutory provisions implicated by the issues raised in the pleadings as well as the trial court's findings. Tenn. Code Ann. § 36-1-113 (2010) sets out the grounds upon which parental rights may be terminated. The statute provides, in relevant part, that grounds for termination exist when "[a]bandonment by the parent or guardian, as defined in

§ 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). In turn, Tenn. Code Ann. § 36-1-102(1)(A)(i)(2010) defines "abandonment," in relevant part, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child. . . .

"To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Angela E.,* 402 S.W.3d 636, 640 (Tenn. 2013)(citing *In re Audrey S*., 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005)). In the present case, for purposes of establishing abandonment by failure to visit or support, the four-month period ran from May 27, 2011 until September 27, 2011, the date the termination petition was filed.

The trial court made extensive findings in support of its decision. We quote pertinent portions of its termination order:

> [S]upervised visitation prior to May 2011 involved [Grandmother] and her husband transporting the [C]hildren to [Mother's and Father's] home for two hours each weekend.

> \* \* \*

> It was apparent from the testimony that during this period in [Mother's and Father's] lives, all of their resources and all of their activities were directed toward their drug habits.

> \* \* \*

> In May 2011, because of difficulties with the supervised visitations conducted by [Grandmother], . . . [Grandmother and Jim] sought and were granted a modification to the custody order, limiting [Mother's and Father's] visitation with their children to supervised visitation at the Parent Place in

-7-

Knoxville. . . . The evidence indicates that [Mother and Father] failed to visit their children at the Parent Place until late October 2011, subsequent to the filing of this Petition for termination. The evidence further indicates that for the 120 days period prior to the filing of this Petition . . ., [Mother and Father] offered no material support for their children, and that subsequent to the filing of this Petition, the only material support offered by [Mother] . . . was a $25 check sent in February 2012, along with unspecified toys and clothing brought to the children . . . during one of [Mother's] intermittent visits.

[F]rom June 2011 through September 2011 when the Petition . . . was filed, [Mother and Father] chose to relocate to Ohio, leaving their children behind in Knoxville . . . in the custody of [Grandmother] and her husband. During this period . . . neither [Mother nor Father] made any effort to provide material support for their children, nor to visit their children . . . .

At trial, Mother admitted that she neither visited the Children nor paid any child support in the four months before the termination petition was filed. She took the position that her conduct was not willful – at first, she was addicted to drugs, then, she was living far away in order to end her drug habit, all of which left her unable to visit or support the Children. In concluding that abandonment was proven, the trial court expressly rejected Mother's testimony to the extent that she suggested that her admitted failure to maintain contact with the Children or provide anything toward their support in the relevant period was involuntary or beyond her control. The trial court stated:

[Mother] attempts to excuse her behavior by arguing that during the early part of the 120 day period in question she was still under the influence of narcotic drugs. . . . [A]s an excuse both for her lack of visitation and lack of support for her children, she argues that once cohabiting with her new boyfriend . . . , she lacked income and transportation resources which would allow her to travel to Knoxville . . . .

* * *

If [Mother] has truly ended her addiction, this Court finds that the most important factor was her choice to cease cohabitation with [Father], a choice which could have as easily been made

-8-

and executed in Knox County as in Dayton, Ohio. Therefore, to the extent that it became more difficult for [Mother] to visit her children subsequent to her decision to relocate to Dayton . . . , such difficulty was of her own making, and was therefore willful.

* * *

Additionally, the Court is not impressed or persuaded by [Mother's] claims that poverty affected her ability to visit or support her children. During the entire 120 day period at issue, [Mother] was never homeless. . . . [Mother], who presented no evidence of any physical or mental condition which would render her incapable of gainful employment, simply chose not to work.

* * *

[T]estimony indicated that [Mother] grossed between $3,000-$3,600 in the course of her employment with Victoria's Secret . . . and yet dedicated none of those funds, apart from a single $25 check, to the support of her children, and apparently failed to set those funds aside to pay the cost of transportation between Dayton and Knoxville. In short, this Court finds that [Mother] was not without means to visit her children, and that even if she was, her lack of means is entirely due to her voluntary decision not to seek or hold gainful employment. . . . The Court finds that as a woman in her mid-20s who appears to the Court to be of average to above average intelligence and not suffering any mental or physical disability which would interfere with her ability to understand the natural consequences of her actions, [Mother's] decision not to seek gainful employment, and therefore not to earn an income which would allow her to provide even token support for her minor children must be considered willful as that term is used in the statutory scheme.

The trial court accurately summarized and properly considered the relevant evidence. As the court observed, the evidence establishing that Mother failed to visit or support the Children during the critical four-month period was "essentially undisputed." The court further found that Mother had no justifiable excuse for abandoning the Children in this

-9-

manner because her decisions and actions were voluntary and willful. We agree. Mother's purported intense focus, above all else, on ending her drug addiction is not persuasive. Mother moved to Ohio in June 2011. She spent the first several weeks smoking marijuana every day with a cousin. She invited Father to join her and they resumed their abuse of pain pills. Within a month, she met and moved in with a new boyfriend. Mother took what little cash she had and paid a utility deposit for her and her boyfriend's new apartment. Otherwise, he supported her completely, while she stayed home and essentially provided him with free child care rather than looking for paid employment. Mother expressly admitted that she was aware of her obligation to support the Children, but denied knowing that her failure to do so was a ground for terminating her rights. She testified, "[h]ad I known that, I probably would have paid child support." Visits were available at Parent Place since May 2011, but Mother did not have her first visit until October 2011. In all, she visited 6-7 times leading up to the trial. After the four-month period had passed, Mother took a seasonal position and earned several thousand dollars. Even then, aside from a single $25 payment, however, Mother paid nothing – none of the money she earned or received from her boyfriend – toward the Children's support. At trial, Mother agreed she had not practiced good parenting, but said she had learned from her past mistakes. On our review of the evidence, however, we find it difficult to discern any significant improvement in her conduct where the Children are concerned. The proof shows only that Mother placed no emphasis on maintaining contact with the Children or providing for their support during month after month before her parental rights were at stake and only a little effort after that.

The evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Mother willfully failed to visit and support the Children. The trial court did not err in terminating Mother's rights on the ground of abandonment pursuant to Tenn. Code Ann. § 36-1-113(g)(1), as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i).

V.

As this Court has observed, "[a] person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the best interest of the child*." In re A'Mari B*., 358 S.W.3d 204, 210 (Tenn. Ct. App. 2011)(citing Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn.2003)). In the present case, the trial court undertook a detailed analysis of all of the statutory factors applicable to its determination of the Children's best interest. The court concluded that all but one of the factors weighed in favor of termination. The court found, for example, that Mother's continuing drug use evidenced her complete failure to make "such an adjustment of circumstance, conduct, or conditions as to make it safe and in the [children's] best interest to be in the home of the parent . . . ." Tenn. Code Ann. § 36-1-113(i)(1). As to this factor alone, the court concluded it was "highly unlikely that [Mother]

-10-

intends, at any foreseeable time, to amend her conduct in such fashion that any Court could, in good conscience, allow these young children back in her care."

As previously noted, Mother does not challenge the trial court's best interest determination. Nevertheless, in the interest of justice, we have reviewed the record and are satisfied with the court's decision. The evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that the Children's interest is best served by permanently severing Mother's parental rights.

## VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to appellant, Megan A.A. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE