725 So.2d 404 (1999)
G.T., Appellant,
v.
ADOPTION OF A.E.T., Appellee.
No. 98-2280
District Court of Appeal of Florida, Fourth District.
January 5, 1999.
Rehearing Denied February 9, 1999.
*405 Lynn G. Waxman of Lynn G. Waxman, P.A., West Palm Beach, and Charlotte Danciu of Charlotte Danciu P.A., Boca Raton, for appellant.
Sharon P. Talbot of Law Offices of Sharon P. Talbot, P.A., Palm Beach, for appellee.
TAYLOR, J.
In this pending adoption proceeding under Chapter 63 of the Florida Statutes, G.T. ("the father") and M.T. ("the mother"), biological parents of the minor child, A.E.T., appeal from an order excusing their consent to the minor child's adoption because of abandonment. K.S., the appellee herein, is the prospective adoptive parent. A.E.T. has been in appellee's custody since his birth over four years ago. After a careful review of the record in this case, we conclude that there was substantial competent evidence to support the trial court's finding that both parents abandoned the minor child. Accordingly, we affirm the order excusing their consent to the adoption. We write primarily to address the position urged by the father that his failure to support and establish contact with the minor child does not constitute willful abandonment because he was unaware that he was the child's legal and biological father as a result of the mother's misrepresentations about paternity and his misunderstanding of the law regarding marital conception and birth.
This case, we observe, appears to be one of first impression in this state. It involves facts which may or may not be that unusual but present an issue upon which there is little or no direct decisional law in Florida. We begin with a summary of the facts, most of which are undisputed and carefully detailed in the trial court's extensive written order.
The mother and father were teenagers when they married in 1992 and bore their first son, Zachary. Soon after Zachary's birth, problems arose in the marriage and the couple separated. The father and son moved into the home of the father's mother. During this period of their separation, the mother began dating a man named "Eddie." She became pregnant and informed a friend, the appellee, that Eddie was the father of her unborn child.
Soon after the mother became pregnant with A.E.T., she and the father resumed their relationship and began living together again. After they reunited, the mother told the father that she was pregnant but that her pregnancy was the result of a relationship with another man. During the first seven months of the mother's pregnancy, the father lived on and off with the mother and contributed modestly towards her living expenses. Sometime around the eighth month, however, the couple separated for the final time and the father returned to his mother's home with Zachary. The expectant mother described herself during this period as alone, financially destitute, and emotionally distraught. Appellee felt sorry for the mother *406 and helped her with her groceries, utility bills and transportation during and after her pregnancy. The mother's parents paid her medical bills and Medicare covered the hospital delivery costs.
Abandonment by the mother
A.E.T. was born on February 14, 1994. After A.E.T.'s birth, the mother moved in with her parents for a few days and then returned to the apartment that she shared with a 16-year old female friend. When A.E.T. was just four weeks old, the mother tried to "give" the baby to her teen-age roommate. However, her roommate declined, protesting that she was too young to care for an infant. Shortly thereafter, the mother took A.E.T. to the roller skating rink where appellee worked and requested appellee to keep A.E.T. According to the mother's roommate, the mother did not want A.E.T. and stated that she would "do what she had to do" and "would put him in the dumpster" if appellee did not take him. Appellee agreed to take A.E.T. and raise him on the condition that some medical tests be performed first and that the mother's family and husband agree to the arrangement.
Upon appellee's suggestion, appellee and the mother phoned the mother's aunt and the father. The father was advised of the plan to place A.E.T. with appellee. He disclaimed any responsibility for the child and advised them to do what they felt was necessary. That same day, appellee and the mother agreed to execute a written consent and, later, worked together to draft its terms and conditions. On March 18, 1994, the mother delivered A.E.T., along with his clothes and furniture, to appellee at her home. Later that day the mother and appellee met with a notary public and executed the consent in her presence. Before notarizing the consent, the notary read it to the mother and asked her "if she really wanted to do it." The mother responded affirmatively and did not appear upset about the transaction.
Notwithstanding provisions in the consent that "I [the mother] will have no visitation or any contact whatsoever from this day forth," there was an understanding between appellee and the mother that she could visit A.E.T. any time. In fact, after the placement, the mother visited A.E.T. 2-3 times per week for approximately one month. During their contact, the mother treated A.E.T. as if he were appellee's child and called him by the new name appellee had given him. After the initial visits during the first month, the mother voluntarily stopped visiting A.E.T. She ended all communication with him, moved to New Hampshire to be with her boyfriend, and did not attempt to visit A.E.T. again until three years later, in May of 1997.
The trial court noted that the mother did go to the authorities approximately one month after she placed A.E.T. with appellee in a "claimed" attempt to regain custody of A.E.T. On June 1, 1994 she filed a habeas corpus petition seeking the return of A.E.T. However, the court concluded that her actions were solely the result of family pressure and not of a "settled purpose to assume all parental duties." The mother's aunt and father testified that the placement of the child with appellee was done without their knowledge and that they were "aghast." At the behest of her aunt and/or her parents, the mother contacted the police, the Florida Department of Health and Rehabilitative Services (HRS), and the state attorney. These agencies got involved and initiated various proceedings. The state attorney filed criminal charges against both the appellee and mother for illegal placement of a baby. The charges were later dismissed. HRS filed a petition for temporary shelter and a subsequent dependency petition, alleging that the child had been abandoned by the mother. However, HRS later voluntarily dismissed the dependency action, stating "No valid allegations of dependency exist in this case." HRS returned A.E.T. to appellee. The circuit court denied the mother's petition for habeas corpus, but proceeded with the appellee's counter-petition for adoption of A.E.T. A copy of the counter-petition for adoption was later served on the father by publication. The counter-petition was subsequently amended to allege abandonment by both parents.
Throughout all of these proceedings, the mother never visited A.E.T., made any attempts to visit him, nor initiated any form of communication with him for a period that *407 spanned approximately four years. At the hearing on abandonment, she admitted confiding in appellee on several occasions that the only reason she was attempting to regain custody of A.E.T. was because of pressure from her family; she denied, however, that she was presently motivated by such concerns. The guardian ad litem who first visited the mother in 1994 characterized the mother as vague and "noncommittal" in her expressed interest in regaining custody of A.E.T. The trial court concluded that the mother abandoned A.E.T. and excused her consent to his adoption.
We first consider the mother's contention that the informal written adoption consent she executed was legally insufficient and involuntary pursuant to Chapter 63 of the Florida Statutes. Significantly, the trial judge specified in his written order that he did not rule upon the legal validity of the written consent. Rather, in determining whether the mother abandoned A.E.T., he considered the consent and the circumstances surrounding its execution as factors bearing upon her intention to "wilfully reject her parental obligations." Where, as here, a natural mother decides to give up her baby because of "generalized social and financial pressures" her decision is deemed to be voluntary provided that no one exerted coercion, duress or fraud to force her to do so. Matter of Adoption of Doe, 543 So.2d 741, 744 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989). The record is devoid of any evidence of coercion or duress. The trial court's finding that the mother knowingly, voluntarily and intentionally relinquished permanent custody of the child is supported by competent substantial evidence in the record. Further, evidence of her conduct subsequent to signing the consent demonstrates that the mother abandoned the child shortly after his birth, openly renounced any parental rights in the child and exhibited little or no interest in the child during the first years of his life. The trial court found that the mother had the ability to support A.E.T., for at least part of the period subsequent to his placement with appellee, but that she did not make any provision for his support nor any effort to establish a relationship with him for over four years. There was sufficient clear and convincing evidence to support the court's conclusion "that [the mother] evinced a willful rejection of her parental obligations" and did not "evince a settled purpose to assume all parental duties."
We, therefore, affirm the order of the trial court finding abandonment by the mother and excusing her consent for purposes of adoption.
Abandonment by the father
The father was married to the mother at the time of A.E.T.'s conception and birth. He lived intermittently with the mother during her pregnancy and provided some financial support. However, during the last month of her pregnancy, he moved out. According to the mother, he did not contribute towards her medical bills or provide her with any psychological support during her pregnancy. The father admitted that he did not pay for any of the hospital delivery expenses.
After A.E.T.'s birth on February 14, 1994, the father visited the mother at the hospital. He testified, however, that he felt no bond with the child because he did not believe he was his father. Within a few months following A.E.T.'s birth, the father filed a petition for dissolution of marriage. A final judgment was entered on May 13, 1994, dissolving the couple's marriage and awarding the father sole custody of their older son, Zachary. During the dissolution proceedings the father maintained that the mother was unfaithful during the marriage and that he was not the natural father of A.E.T. No provisions were included in the final judgment regarding paternity, custody or child support for A.E.T.[1]
In August of 1994 the father relocated to Alabama, where he resided with his parents until he remarried. He did not contact or attempt to contact A.E.T. directly or through *408 appellee for almost four years. His first visitation with A.E.T. since his birth did not occur until the second week of April, 1998.
At the hearing on abandonment, the father acknowledged that appellee contacted him soon after A.E.T.'s birth to inform him of the mother's plan to place A.E.T. with her. He admitted denying that he was the child's father and advising her to do whatever she felt was best. Prior to relocating to Alabama, the father attended two court hearings regarding placement of A.E.T. He confided in appellee that he believed it was in A.E.T.'s best interest to remain with her, but that he was being pressured by the mother's family to assist them in regaining custody of A.E.T. When he moved to Alabama, he left no forwarding address to appellee or any member of the mother's family. He testified that he "ignored" letters he received from appellee's attorney regarding A.E.T.'s adoption. Though he admitted discussing with his second wife the possibility that he could be A.E.T.'s father, he acknowledged that he did nothing to ascertain the truth of his paternity. He persisted in his passive stance regarding A.E.T.'s parentage even after being contacted by the guardian ad litem sometime between February 25 and April 18, 1997. It was not until he was erroneously warned by his former mother-in-law that he could be prosecuted for "abandonment" and "bigamy" that he obtained counsel and actively involved himself in the adoption proceedings.
Following mediation in May, 1997, the father agreed to complete paternity testing. However, he allowed seven months to pass before undergoing testing. He testified that the delay was caused by his inability to pay for the testing and to travel to the nearest testing facility, which was approximately fifty miles away from his home. When DNA test results confirmed in April, 1998 that he was A.E.T.'s biological father, he immediately contacted appellee and made arrangements for visitation with A.E.T. He visited the child once, brought him some toys, telephoned him a few times, and sent him an Easter card and gift.
The court characterized his efforts to communicate with A.E.T. upon confirming his paternity as "marginal." It further found that the father had the "financial means, maturity and emotional maturity" to provide support to A.E.T., but failed to furnish him any financial support whatsoever or attempt to establish any contact with him. The father admitted that the prospective adoptive mother never denied him visitation rights with the child or an opportunity to provide him with financial support.
The father defends his failure to assume any parental responsibilities for A.E.T. over a four-year period upon his mistaken belief that he was not A.E.T.'s father. While the trial judge acknowledged that "it was [the mother] who created the problem by repeatedly telling [the father] and others during the pregnancy that the child was the result of a relationship with another man," he noted that the father was married to the mother at the time of the child's birth and obviously had access during the relevant period. The court found that notwithstanding the father's status as A.E.T.'s legal and biological father, he failed to make sufficient and timely efforts to assume his parental duties and "evinced a willful rejection of his parental obligations of [A.E.T.]." Concluding that there was clear and convincing evidence that the father abandoned A.E.T., the court waived his consent to the adoption.
The Florida Adoption Statute, Section 63.062(1) (1997), requires the written consent of both parents to an adoption unless consent is excused by the court. A parent's consent can be excused or "waived" by the court pursuant to section 63.072(1) upon a determination that he or she abandoned the child. The term "abandoned" is defined in § 63.032(14):
"Abandoned" means a situation in which the parent or legal custodian of a child, while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of such parent or legal custodian to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. *409 In making this decision, the court may consider the conduct of a father towards the child's mother during her pregnancy.
The Florida Supreme Court has made it clear that a determination of whether a parent has abandoned a child for purposes of the adoption statute is "fact-specific." It declined to "dictate to trial courts precisely how to evaluate the factors that go into making this decision." See In Re Adoption of Baby E.A.W., 658 So.2d 961, 966 (Fla.1995), cert. denied, 516 U.S. 1051, 116 S.Ct. 719, 133 L.Ed.2d 672 (1996). Acknowledging the holding of the United States Supreme Court that "natural parents have a fundamental liberty interest in the care, custody, and management of their children," id. at 966 (citing Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)), E.A.W. followed the stringent Santosky standard of clear and convincing evidence of parental misconduct or neglect before termination of a parent's right. 455 U.S. at 748, 102 S.Ct. 1388.
Clear and convincing evidence has been defined by our supreme court as an:
intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
Inquiry Concerning Davey, 645 So.2d 398, 404 (Fla.1994)(quoting E.A.W., 658 So.2d at 967).
E.A.W. also explained that on review the appellate court cannot reweigh the testimony and evidence, or substitute its judgment for that of the trier of fact. The trial court's finding must be affirmed if there is evidence in the record that would support "any theory or principle of law which would support the trial court's judgment in favor of terminating... parental rights." E.A.W., 658 So.2d at 967 (quoting Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993)).
Applying this standard of review, we conclude that the record shows substantial competent evidence to support the trial judge's finding that the father abandoned A.E.T. The court's determination of abandonment was based upon a multitude of factors and should not be disturbed by this court. Specifically, the court found that the father abandoned the child when he failed to provide prebirth financial and emotional support to the mother, failed to make provisions for the child in the dissolution action, moved away to Alabama without establishing or maintaining contact with the child and his caretaker, failed to financially support him in the intervening years, failed to respond to inquiries regarding pending adoption proceedings, unreasonably delayed submitting to paternity testing and, upon confirming his parentage, failed to make more than marginal efforts to contact or support his son.
The father claims that his mistaken belief that he was not the child's father is a valid "defense" to abandonment because his failure to financially support the child or assume any parental duties prior to the determination of paternity was not willful. To find abandonment, the court must find clear and convincing evidence of a "willful rejection of parental obligations." Thus, a fair resolution of this issue turns upon a reasonable interpretation of the term "willful" in the definition of abandonment. While we agree that abandonment is an intentional relinquishment or surrendering of parental rights and responsibilities, we do not believe that the term "willfulness," as applied to a determination of abandonment under the adoption statute, is necessarily the equivalent of the element of "willfulness" essential to a finding of criminal culpability under a penal code. As Justice Shaw emphasized in Matter of Adoption of Doe, 543 So.2d 741 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989):
Abandonment under chapter 63 is not a criminal prosecution for the purposes of punishing parents; it is a civil proceeding intended to serve the best interest of the child.
Id. at 744 (footnotes omitted).
He explained that:
A finding under chapter 63 means, for whatever reason, the parent or parents *410 have not provided the child with emotional and financial sustenance and, consequently, the well-being of the child requires severing the parent's legal custody or relationship with the child.
Id. at 744 (emphasis supplied).
The inquiry focuses not so much on a finding of fault as it does on whether there has been a demonstration, through actions, of a commitment to the childa manifestation of a willingness to accept custody and assume responsibility for the support and maintenance of the child. In determining whether a particular case involves a "situation ... sufficient to evince a willful rejection of parental obligations," section 63.032(14) requires the court to fully evaluate the efforts on the part of the parent to support and communicate with the child. Based upon our examination of the record, we conclude that the trial court considered relevant criteria and correctly applied a "clear and convincing evidence" standard in judging the father's conduct.
We note first, as did the trial court, that this case involves a father who was married to the biological mother at the time the child was conceived and born. Florida law presumes that a man married to the biological mother is in fact the legal father of the child. This presumption is one of the strongest rebuttable presumptions known to law and is based on the child's interest in legitimacy and the public policy of protecting the welfare of the child. See Department of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305 (Fla.1993); Dennis v. Department of Health & Rehabilitative Servs., 566 So.2d 1374 (Fla. 5th DCA 1990); Barrett v. Reed, 363 So.2d 14 (Fla. 1st DCA 1978); Smith v. Wise, 234 So.2d 145 (Fla. 3d DCA 1970). According to Justice Kogan, "this policy is a guiding principle that must inform every action of the courts in this sensitive legal area." Privette, 617 So.2d at 307.
Unlike an unwed putative father who enjoys a mere inchoate right to establish legal fatherhood, the father herein began at the outset with parental rights firmly grounded in principles of law. Sadly, however, he sat on those rights and allowed them to lapse through years of neglect and failure to act responsibly in settling the issue of his paternity. For a father's "unmistakable interest in maintaining the relationship with his child unimpugned"[2] carries a corresponding enforceable duty to support the child. See E.A.W., 658 So.2d at 971.
In his concurring and dissenting opinion in E.A.W., Justice Kogan discussed the importance of biological fathers making timely and adequate assertions of their parental rights:
In the law it is axiomatic that one who sits on his rights forfeits them, and this is no less true of biological fathers with respect to their offspring. A biological father who does not assert his opportunity interest soon after birth simply cannot be equated with one who does. The Fourteenth Amendment's due process clause provides many protections, but these do not include a "second chance" to invoke a lapsed right.
Id. at 975.
Justice Kogan's analysis of how the passage of time should impact upon an evaluation of a biological father's conduct in determining abandonment applies with equal force to the behavior of a legally recognized father. Notwithstanding the greater rights and protections for legal fathers, a legal father nonetheless has a responsibility to promptly assume his parental role or risk losing it. While temporary failures and dereliction of parental duties may be tolerated so as to avoid a finding of abandonment, a complete renunciation and total neglect of these duties would certainly be sufficient evidence of willful abandonment for adoption purposes. See Solomon v. McLucas, 382 So.2d 339 (Fla. 2d DCA 1980)(teenage mother's temporary inability to care for child not abandonment); In Re Adoption of Gossett, 277 So.2d 832 (Fla. 1st DCA 1973)(father's failure to support daughter for twenty-four months while in military not abandonment when following discharge he matured and sought to exercise parental responsibilities).
After an evidentiary hearing, the court concluded that the father's reliance on the mother's representations that he was not the child's father was unjustified and unreasonable under the circumstances. The trial judge felt that her bare assertions regarding *411 paternity did not excuse the father's failure to support and communicate with the child. In addition to the legal presumption that A.E.T. was his son, testimony at the hearing revealed that for at least three and a half years the father was aware of the possibility he was A.E.T.'s father from various sources. Yet, he did nothing to assert his parental rights or ascertain the truth about his paternity. He chose instead to leave the issue unsettled and moved out of the state without making any provision for support or communication with the child. The court found that it was only after the father thought he was going to be criminally prosecuted for abandonment and bigamy that he retained an attorney and got involved in the adoption proceedings. The court was also critical of the father's seven-month delay in paternity testing after mediation. It rejected his excuse that he lacked the financial means and transportation for testing. Additionally, the court deemed the father's efforts to visit the child after confirming his paternity to be too little too late. In its written order, the court stated that the father "evinced a willful rejection of his parental obligations of [A.E.T.]" and that any effort he made to support and communicate with the child was "marginal at best, and has not been with the intention to assume his parental duties, but to satisfy the mother's family and/or in response to his mistaken belief that he would be the subject of criminal prosecution." We agree with the trial judge that the evidence in this case established an abandonment under Section 63.032(14).
Before concluding, we mention one troubling aspect of this case. From our review of the record there emerges a sympathetic portrait of a young mail who is a far cry from those fathers belatedly asserting paternity rights, whose histories show a pervasive pattern of evading parental responsibility. We find it significant that very early in the couple's relationship, the father accepted full measure of responsibility for the couple's first child, Zachary. He continuously cared for Zachary during the couple's separation and eventually obtained sole custody of him in the divorce proceedings. He remarried, maintained steady employment as a welder, and provided a warm and loving home for Zachary. Given this positive proof of his fitness as a father, it seems that it would be difficult to form a "firm belief or conviction without hesitancy" of his willful rejection of parental obligations towards a second child. However, the trial court, carefully weighed the "totality of circumstances" surrounding his significant delay in asserting any interest in his second son before concluding that his conduct amounted to abandonment. Furthermore, the court reasonably rejected the father's argument that his lack of awareness of his paternity and misadvice of counsel negated a finding of abandonment. The duty to support one's legally recognized child does not turn upon his actual knowledge of paternity. A husband is presumed to be the father of a child born during the marriage and must provide for support of the child unless and until the husband meets his burden of disproving paternity. See Lopez v. Lopez, 627 So.2d 108, 111 (Fla. 1st DCA 1993).
Because the record supports the trial court's finding of clear and convincing evidence of abandonment, we affirm the trial court's order finding abandonment by the father and excusing his consent for purposes of adoption.[3]
With respect to the second point raised by the father that the final judgment dissolving the marriage of the mother and father is void and should be vacated because it failed to provide for the care and custody of A.E.T., we find that the issue was not timely or properly made a subject of this appeal and, further, is now moot in light of our above conclusions.
AFFIRMED.
GUNTHER and STEVENSON, JJ., concur.
NOTES
[1] It is undisputed that the father disclosed the existence of the child to his attorney. Inexplicably, his attorney advised him that since he was disclaiming paternity the dissolution proceedings would not have to involve A.E.T. A.E.T. was, therefore, not included in the petition's Uniform Child Custody Declaration or the final judgment.
[2] Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[3] At the hearing the prospective adoptive mother testified that if she prevails in this adoption proceeding, she is willing to allow the father to establish and maintain a meaningful relationship with A.E.T. We hesitate to offer any direction or guidance in this regard but commend her position on the matter.