# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 29, 2015 Session

## IN RE L.J., JR.

### Appeal from the Juvenile Court for Knox County
### No. 120261      Timothy E. Irwin, Judge

_____

### No. E2014-02042-COA-R3-PT-FILED-AUGUST 31, 2015
_____

J.S.H. (Mother) appeals the termination of her parental rights to her child, L.J., Jr. (the Child).[1]  Mother contends that the trial court erred in its finding – said to be made by clear and convincing evidence – that she abandoned the Child by willfully (1) failing to pay support and (2) failing to visit the Child in the four months immediately preceding the filing of the termination petition.  She also challenges the trial court's holding that she failed to provide the Child a suitable home.  Mother argues that the trial court erred when it held that termination is in the Child's best interest.  Mother has three other children, B.H., J.T., and A.T.  The Department of Children's Services (DCS) was awarded temporary legal custody of all of the four children on September 20, 2012, due to the trial court's finding that each was dependent and neglected.  Mother's other three children now live with their paternal grandmother.  Only Mother's parental rights with respect to L.J., Jr. are at issue on this appeal.  We modify the trial court's judgment.  As modified, the judgment terminating Mother's rights is affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed as Modified; Case Remanded

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, J.S.H.

Herbert H. Slatery, III, Attorney General and Reporter, and Rebekah A. Baker, Senior Counsel, Office of Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Patricia Anne Greer, Knoxville, Tennessee, Guardian ad Litem for L.J., Jr..

---

[1] The Child's biological father, L.J., Sr. (Father) did not participate in the trial.  His parental rights were terminated on July 1, 2014 in a separate proceeding.

## OPINION

### I.

This matter was heard in the trial court on August 21, 2014 and October 16, 2014. The evidence reflects the following. The Child was born out of wedlock on March 24, 2012; he was born premature at thirty-three weeks gestation. The Child required treatment in the neonatal intensive care unit (the NICU). Shortly after his birth, issues with Mother's care for the Child surfaced at the hospital, prompting the involvement of DCS. DCS cited concerns over (1) Mother's failure to complete "rooming in" training, which failure resulted in the Child being left in the NICU for a week, and (2) despite warnings, Mother sleeping with the Child in a dangerous way.

During the summer after the Child's birth, multiple incidents indicated that all of Mother's children were dependent and neglected. First, the Child suffered injuries that required medical treatment while in Father's care. This prompted DCS to obtain a restraining order against Father, which Mother failed to comply with. Second, law enforcement was called after Mother left the Child with two of her other children – then ages one and four – in a locked apartment for thirty minutes while she went to the bus stop to pick up a fourth child. Third, a DCS caseworker found that the children's cribs were in pieces on the apartment floor, and Mother later testified she and her four children had been sleeping on couches. Fourth, Mother was set to be evicted from her apartment at the end of October 2012, due to fraud on her housing application. For all of the above cited reasons, DCS was awarded temporary legal custody. The Child has been in foster care with one family since that time.

On October 2, 2012, Mother entered into a family permanency plan developed by DCS. The trial court found that, among other things, the permanency plans required Mother to: (1) complete age-appropriate parenting classes and demonstrate learned skills during visitation; (2) complete a mental health assessment and follow any recommendations, including taking medications as prescribed and attending therapy; (3) obtain and maintain a legal source of income and safe, stable housing free from environmental hazards, domestic violence, drug abuse, or other risks to the children. DCS and the juvenile court informed Mother multiple times that her failure to comply with the permanency plan, participate in visits with the Child, or provide support may lead to the termination of her parental rights.

Over the course of the next seventeen months, Mother struggled to comply. Her visits with the Child were inconsistent, as were her support payments. She failed to take the steps necessary to sufficiently manage her mental health. She lived with friends and family, being unable or unwilling to obtain appropriate housing for her family. She was employed regularly as of December 2012, though she changed jobs several times.

DCS filed a petition to terminate Mother's parental rights to the Child on March 4, 2014. Following this, Mother took several steps to comply with the permanency plan. Two months *after* the initiation of the termination proceedings, Mother completed parenting classes. About six months after the initiation – and more than two years after the state removed her children – Mother obtained a one-bedroom apartment. She also completed a mental health screen and picked back up with medication management of her mental health issues. Though she still neglected to attend therapy, she did begin attending anger management classes at the YWCA.

The trial court ordered the termination of Mother's parental rights to the Child on November 15, 2014. The court found that DCS proved by clear and convincing evidence abandonment by willful failure to visit and willful failure to support during the four months immediately preceding the filing of the petition. In addition, the court found that Mother failed to provide a suitable home. Mother timely filed a notice of appeal.

## II.

On appeal, Mother raises two primary issues, *i.e.*, (1) whether the trial court erred in finding by clear and convincing evidence that Mother had abandoned the Child, as defined by Tenn. Code Ann. § 36-1-102(1)(A)(i)-(ii), through (a) willful failure to pay child support during the four consecutive months immediately preceding the filing of the petition for termination; (b) willful failure to visit the child during the four consecutive months immediately preceding the filing of the petition for termination; and (c) failing to provide a suitable home for the child; and (2) whether the trial court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the best interests of the Child under Tenn. Code Ann. § 36-1-113(c)(2).

## III.

We apply the following standard of review in cases involving the termination of parental rights: "this Court's duty . . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). In this non-jury case, we review the findings of fact by the trial court *de novo* with a presumption of correctness, unless the preponderance of the evidence suggests otherwise. Tenn. R. App. P. 13(d); *State Dep't of Children's Services v. T.M.B.K.*, 197 S.W.3d 282 (Tenn. Ct. App. 2006). The trial court's findings of law are given no such presumption. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993); *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

A biological parent's fundamental right to make decisions concerning the care, custody, and control of his or her child is protected by the due process clauses of the

federal and state constitutions. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). While this fundamental right is superior to claims of other persons and the government, it is not absolute. *In re A'Mari B.*, 358 S.W.3d 204, 208 (Tenn. Ct. App. 2011); *State Dep't of Children's Servs. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004).

In Tennessee, parental termination proceedings are governed by statute. A parent's rights may be terminated only after (1) a finding by the court by clear and convincing evidence that at least one ground for termination has been established; and (2) that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re A'Mari B.*, 358 S.W.3d at 208. The second element also must be established by clear and convincing evidence. *Id.* (citing Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d at 639. The statute requires clear and convincing evidence because of the significance of the right at stake. Terminating parental rights has "the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian." Tenn. Code Ann. § 36-1-113(l)(1).

IV.

A.

In relevant part, a termination of parental rights under Tenn. Code Ann. § 36-1-113(g) may be initiated when "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). To prove abandonment, DCS must establish that "for a period of four (4) consecutive months" Mother either "[(1)]willfully failed to visit or … willfully failed to support or … [(2)] willfully failed to make reasonable payments toward the support of her children." Tenn. Code Ann. § 36-1-102(1)(A)(i). Clear and convincing evidence of abandonment is sufficient to establish that "the parent is unfit or that substantial harm to the child will result if the parental rights are not terminated." *In re Swanson*, 2 S.W.3d at 188; *In re Valentine*, 79 S.W.3d at 546.

In this context, "willfulness contains an element of intent to abandon the child." *Means v. Ashby*, 130 S.W.3d 48, 55 (Tenn. Ct. App. 2003) (citing *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999)). This intent does not require culpability, malevolence, or ill will. *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005) (citing *G.T. v.*

4

*Adoption of A.E.T.*, 725 So.2d 404, 409 (Fla. Dist. Ct. App. 1999)). Instead, willful conduct requires only that a person acts as a free agent, aware of what she is doing and intending what she is doing. *In re Audrey*, 182 S.W.3d at 863-64.

To determine "abandonment" under Tenn. Code Ann. § 36-1-102(1)(A)(i), a court considers the parent's actions in the four consecutive months immediately preceding the filing of the petition for termination. *Id.* Here, the petition was filed on March 4, 2014. Thus, the relevant time period is November 4, 2013, to March 3, 2014.

"Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes a *willful* abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)) (emphasis added.)

Abandonment may also be found under certain circumstances when a parent fails to establish a suitable home. If a child was placed in DCS custody on grounds of dependency and neglect under Tenn. Code Ann. § 37-1-102 after DCS made reasonable effort to prevent removal, then abandonment can be established if parent made no reasonable effort to establish a suitable home for the child within four months after removal if (1) DCS made reasonable effort to help establish such a home and (2) parent has "demonstrated a lack of concern for the child to such a degree that it appears unlikely that [parent] will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii).

Mother challenges the trial court's finding that she willfully abandoned the Child through failure to visit, failure to support, and failure to provide a suitable home. Namely, Mother asserts that DCS did not prove by clear and convincing evidence that she acted willfully and that her efforts were no more than "token."

B.

The trial court found that in the relevant time period, Mother participated in three of eight offered visitations. From November 4, 2013, to March 3, 2014, Mother failed to appear for scheduled visits on November 5, November 19, December 17, January 14, and February 25. During the same four-month period, she appeared for visits on December 10, January 30, and February 11. Based on this information, the trial court concluded that Mother "has willfully failed to engage in more than token visitation with the child." Under the statute, "'token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such a short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). "Whether a visit is 'token' under this definition is a fact-intensive inquiry to be decided on a case-by-case basis." *In re Keri C.*, 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010).

Mother argues that she took part in 37.5% of the visits offered within the four-month time frame and that this percentage constitutes more than token visitation. The trial court disagreed, based on the high number of missed visits: "At times she did great, but what the law says is that four months, from November to March, that period right there, how did she do[?] Three out of eight, that's how she did. That's token in my book."

The trial court expressed that Mother's "visitation overall is a lot better" than the four-month period under review in Tenn. Code Ann. § 36-1-102(1)(C). But her overall record appears to be only slightly better. According to the bonding assessment, from May 13, 2013, through May 1, 2014, there were thirty visits scheduled. Of those, Mother attended twelve and was late to two; Mother cancelled fifteen, often giving the excuse of work conflicts or lack of transportation; and three were "no shows." By this count, Mother attended forty percent of available visits over the course of nearly a year. The bonding assessment completed by Omni Community Health Clinical Manager Leigh Anne Goldstine indicates a "pattern [where] . . . the mother would visit approximately bi-weekly and then not see her son for a month or two." It does not appear that her visitation during the relevant four-month period is overly unique from her pattern for visitation over the course of the surrounding year.

To determine sufficient visitation, the court should consider quality as well as quantity. "The concept of 'visitation' is much more than a mere physical presence." *State Dep't of Children's Services v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. E.S., Dec. 30, 2003). For instance, previously this court found that a mother who attended all but two of her scheduled visits with her child still failed to make more than "perfunctory" visits because she "spent her 'visitation' sessions applying makeup in the bathroom, sleeping, or arguing with Father." *Id.* at *6. In that case, the woman's behavior showed "absolutely no evidence that a meaningful relationship was ever established between Mother and child." *Id.*

In the present case, when the Mother attended the visits during the four-month period, she generally seemed engaged, based on testimony from DCS caseworkers believed by the trial court. DCS caseworkers testified that the Child typically cried throughout the beginning of the visit, but usually would stop after efforts from either the Mother or a caseworker to soothe him. Mother testified that when the formal visitations began they were "very, very horrible . . . because he cried the whole time, and nobody did anything about him crying . . . [the caseworkers] would just sit and let him literally scream for hours." In more recent visits, after the Child would stop crying, Mother and the Child typically would spend the remainder of the visit interacting. Mother sometimes would bring snacks for the Child or money for the vending machine. DCS caseworker Scott Williams testified that in a visit on September 12, 2013, he taught Mother occupational therapy exercises and that he then observed Mother walking through the

6

exercises with the Child.  Mother was able to walk through these same exercises with the Child in a later visit on December 10, 2013.  The trial court found her behavior in these visits indicated that "she has some skills, she is able to console a child that doesn't want to be with her, that screams, doesn't really know her as well as he once did, or at all, but she has some motherly skills."

Still, the trial court found that her absences during the four-month time period were too significant to overcome.  Mr. Williams testified that on several occasions, Mother made no attempt to contact him to cancel before visits, nor did she provide an excuse for her absence after the fact or request to reschedule.  When Mother provided an excuse for her absence, she attributed it to a lack of transportation and work conflicts.  Testimony presented at trial reveals that DCS provided her with bus passes and on some occasions case workers even transported her to visits themselves.

In determining adequate visitation, the court is also interested in the relationship developed between the parent and child before the four-month period considered in Tenn. Code Ann. § 36-1-102 and the parent's interest in this relationship.  *In re Keri C.*, 384 S.W.3d at 749.  "[T]his is relevant background and context for the necessary fact-intensive evaluation of whether the visitation *during* the four-month period was merely 'token.' "  *Id.*  Whether the parent and child had a relationship prior to the four-month window can give the court a clearer understanding of the significance of the setting and length of time of the visits during the four-month period.  *Id.*  Here, the Child was moved out of his Mother's home and into a foster home before he was six months old.  For almost all of his life, the Child's relationship with his mother has been built during these scheduled visits, many of which she failed to attend.

Mother argues that DCS failed to make reasonable efforts to reunite her with the Child by delaying therapeutic visitation for Mother and the Child until April 2014, despite the fact that such visits had been ordered in the permanency plan updated on January 24, 2014.  Mother argues that once therapeutic visits were reinstated, the Child cried less, allowing the visits to be more manageable and worthwhile.  According to the bonding assessment, DCS provided therapeutic visits for Mother and the Child from December 2012 until April 30, 2013.  DCS caseworker Jessica Vineyard testified that the initial therapeutic services were subsequently discontinued due to Mother's noncompliance with the provider's instructions.  Mother also blames the Child's foster mother for "restrict[ing], sabotag[ing] or interfer[ing] with the Mother's visitation and in doing so, denying Mother opportunities to visit and engage in the child's life."  Mother argues that, among other things, visit times were switched to the Child's usual nap time to better accommodate the foster mother's schedule, despite the disturbance it created for Mother's visits.

The conduct of another "does not excuse a biological parent's failure to support or visit unless that conduct either prevents the parent from performing his or her duty or

7

amounts to a significant restraint or interference with the parent's effort to support or develop a relationship with the child." *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *20 (Tenn. Ct. App. W.S., May 4, 2005) (citing *In re Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. M.S., Nov. 25, 2003); *see also In re K.S.O.H.,* No. E2001-00055-COA-R3-CV, 2001 WL 1173302, at *7 (Tenn. Ct. App. E.S., Oct. 4, 2001)). A significant restraint or interference could be brought about by another "([1]) blocking access to the child, ([2]) keeping the child's whereabouts unknown, ([3]) vigorously resisting the parent's efforts to support the child, or ([4]) vigorously resisting a parent's efforts to visit a child." *In re Muir*, 2003 WL 22794524, at *5, n.8. Neither DCS nor the foster mother blocked access to the Child or vigorously resisted Mother's efforts to support or visit. Therefore, Mother's claim of interference is unfounded. There is no evidence that indicates the foster mother interfered with Mother's ability to attend visitations. Mr. Williams testified that he gave Mother a calendar on December 10, 2013, and encouraged her to write her visitation dates with the Child in the calendar. Mother's testimony confirmed that she received the calendar and used it up until the time of trial. Still, she missed three of the five scheduled visits with the Child after receiving the calendar.

Based on the above facts, the trial court's finding, by clear and convincing evidence, that Mother abandoned the Child through a willful failure to visit is not contrary to the preponderance of the evidence.

C.

"Failure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. M.S., May 12, 2004). It is undisputed that Mother was aware of her duty to pay support. Because Mother knew of her duty and had made some payment to the Child, the issue becomes whether she made more than "token" payments. " '[T]oken support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). In this context, "the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d at 641 (citing *In re Z.J.S.*, No. M2002–02235–COA–R3–JV, 2003 WL 21266854, at *11 n.24 (Tenn. Ct. App. M.S., June 3, 2003)).

Mother alleges that there was a lack of clear and convincing evidence that she willfully failed to make more than "token" support payments. During the applicable four-month period, Mother made two payments of $64.61. In all, this amounted to 24.75% of the $522 she owed.

8

In consideration of her income, the trial court found Mother had gone through periods of unemployment since her children were taken into state custody, but generally had maintained either full or part-time employment through various jobs at hotels, fast food restaurants, and a temporary employment agency. At each job, she reported earning $7.25 to $8.25 an hour. Specifically, Mother was consistently employed during the relevant four-month period. We conclude that the evidence does not preponderate against the trial court's finding that Mother had the ability to meet her support obligation to the Child.

Mother argues that she had other necessary expenses that the trial court did not consider. Namely, she argues that the trial court made no finding as to whether she owed child support payments to her three other children. As a result, she argues the trial court could not have clearly and convincingly determined whether, given her means, she had the capacity to provide payments for the Child's support.

Previously, this court has held that – considering a parent's earnings and expenses – paying one-third of the total amount owed during the four month period *can* amount to more than mere token support. *In re Adoption of Alexander M.S.F.*, No. M2012-02706-COA-R3-PT, 2013 WL 4677886, at *6 (Tenn. Ct. App. M.S., Aug 27, 2013). In that case, the court reviewed evidence related to the father's income and expenses, then weighed whether payments were "insignificant, given his means." *Id.* Previously our Supreme Court has found that a petitioner who did not provide sufficient evidence of respondent's income *and* expenses failed to prove by clear and convincing evidence that the respondent paid only token support when he paid thirty-four percent of the total amount owed. *In re Adoption of Angela E.*, 402 S.W. at 641. "[I]n *Angela E.*, the issue was … whether biological father could have paid more, given his means. Biological father's expenses were, therefore, highly relevant to that determination." *In re Jamie G.*, No. M2014-01310-COA-R3-PT, 2015 WL 3456437, at *15 (Tenn. Ct. App. M.S., May 29, 2015). In determining a parent's overall expenses, this court has previously considered the parent's expenses for rent, insurance, utility bills, groceries, household items, the costs of supervised visitation if applicable, and the cost of transportation to get to and from visits. *In re Alysia S.*, 460 S.W.3d 536 (Tenn. Ct. App. 2014).

Similarly here, determining whether Mother's 24.75% of payments constitute "token" support asks whether she had the capacity to pay more given her means. At trial, little information was introduced regarding Mother's monthly expenses. The trial court detailed that Mother faced an outstanding $1,400 debt to KCDC and additional child support arrearages of $304.45, to be paid in monthly installments of $9.50 beginning December 2012. It is unclear if Mother had to pay the $1,400 bill or if it was forgiven following the end of KCDC's housing prohibition against Mother, which ended in January 2015. It is also unclear whether Mother paid child support for her other three children or whether she paid living expenses, such as rent or utilities, while staying with friends and family before obtaining her own housing in October 2014. The trial court

heard evidence that Mother had to pay one month's rent and a security deposit to execute her lease. Without more complete evidence, the trial court was left to speculate on Mother's expenses.

During the relevant four-month period, Mother's payments were well below what was asked of her. She paid less than one-fourth of her total obligation for the Child, which is even less than the portions paid in the above referenced cases. In November and December 2013, Mother made no payment and gave no explanation, although she generally was employed at the time. In determining whether her payments are "token," the trial court emphasized that it took Mother "two years to get any real progress." It is true that Mother generally had a weak track record for making child support payments while the Child was in foster care. For instance, throughout 2013 she was obligated to pay $130.50 per month to support the Child, but she failed to make any payments for nine of twelve months. In total, she paid approximately ten percent of the amount owed that year, despite reporting overall regular employment. Still, her failure to make progress during the two years the Child was in foster care is outside the scope of the "abandonment" determination under Tenn. Code Ann. § 36-1-102(1)(A)(ii).

Based on the above evidence, the trial court found that Mother's payments were merely "token." We disagree. The evidence supports that Mother was aware of her duty, made no attempt to pay for two of the four months, and paid less than half of her obligation in the other months. She gave no justifiable excuse. Regardless, it is unclear from the evidence whether or not the payments were insignificant given Mother's means because there is insufficient evidence related to her expenses. If DCS expects a trial court to make a finding by clear and convincing evidence of a willful failure to support, it must put on evidence that clearly and convincingly shows "willfulness." A trial court cannot be left to speculate about this important element of failure to support. The trial court's finding, said to be made by clear and convincing evidence, that Mother abandoned the Child through a willful failure to make payments is not supported by a preponderance of the evidence.

### D.

Mother also contests the trial court's determination that she failed to provide a suitable home for the Child. The trial court found as follows. The Child was removed from Mother's home and placed in state custody based on dependency and neglect under Tenn. Code Ann. § 37-1-102, despite DCS's reasonable efforts to prevent removal. For a period of four months after the Child was removed, DCS made reasonable efforts to help Mother find a suitable home. In that time, Mother made no reasonable effort to obtain a suitable home and demonstrated a lack of concern for the Child to such a degree that it appears unlikely that she will be able to provide a suitable home for the Child at an early date. Mother had lived with family and friends for two years while her children were in

custody, but obtained housing only two weeks before the final trial date in the termination proceeding. For the trial court, this was too little, too late. We agree.

Under Tenn. Code Ann. § 36-1-102(1)(A)(ii), failing to provide a suitable home is a ground for abandonment if the child was removed from the parent's home by court order on grounds of dependency and neglect. The statute requires DCS to make "reasonable efforts to assist the parent" during the four months immediately following the removal. *Id.* The statute goes on to define "reasonable efforts" as ones that "exceed the efforts of the parent" to obtain housing. *Id.*

DCS assisted Mother's housing search during the two years her children were in custody. Based on case notes from Helen Ross McNabb submitted as evidence at trial, in the four months after the state took custody of Mother's children, caseworkers provided Mother with a pamphlet of apartment listings in Knoxville and drove her to several area apartment complexes to complete rental applications. Similar efforts continued well beyond the initial four months following the removal. For instance, Ms. Vineyard, who worked on the Child's case through Helen Ross McNabb from September 2013 to March 2014, testified that she had spoken with Mother about her need to find permanent housing, given Mother the a local resource guide with housing assistance information, and shown her how to locate information in the guide. Similarly, Debra Daugherty, a family service worker for DCS in Knox County who began working with Mother and son in March of 2014, recommended to Mother the name of several apartments where she could apply.

Despite this assistance, Mother had made no progress on finding housing by the time the petition for termination was filed in March 2014. About six months later, she signed a one-year lease beginning on October 1, 2014. Ms. Daugherty testified that she has visited the apartment and found it to be appropriate – Mother had her own bed in her room and the apartment also had a couch, table and chairs, and adequate food. However, Ms. Daugherty expressed concerns as to whether Mother could maintain suitable housing.

The evidence does not preponderate against the trial court's finding with respect to the suitable home issue. Despite reasonable assistance, Mother failed to find housing for approximately two years after the state removed her children from her home. This demonstrates a lack of concern for her children to such a degree that it is unlikely she will be able to maintain a suitable home.

## V.

Mother contests the trial court's finding that termination of her rights is in the Child's best interest. In her brief, "Mother would simply argue that the record does not support the trial court's finding." Pursuant to Tenn. Code Ann. § 36-1-113(i), the trial

11

court applied the following factors to determine whether termination of Mother's parental rights is in the Child's best interest:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

\* \* \*

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(5), (7)-(9). Under Tennessee law, "[t]he above list is not exhaustive and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *In re J.B. Jr.*, No. E2013-01677-COA-R3-PT, 2014 WL 793632, at *4 (Tenn. Ct. App. E.S., Feb. 27, 2014) (quoting *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007)). Applying the above factors, the evidence does not preponderate against the trial court's finding that it was in the best interest of the Child to terminate Mother's parental rights.

Since being removed from his Mother's home in September 2012, the Child has been with a single foster family. The trial court found that removing him from the foster home now would be a "serious detriment," stating the Child "would be devastated" and "crushed." Several caseworkers and Mother herself testified that the Child cried loudly during most visits, especially at the start of the visits. The trial court attributes this to the fact that the Child was being separated from his foster parents – "scared because the people that have been taking care of him aren't there."

Currently, the Child has special medical needs that require him to regularly attend appointments with a speech therapist, an occupational therapist, a neurologist, and a gastrointestinal specialist, in addition to more standard appointments such as the dentist and pediatrician. Since the Child has been in foster care, his foster mother primarily has been the person who takes him to each appointment. Mother has rarely been in attendance. Ms. Daugherty expressed concerns as to the Mother's preparedness and ability to take over for the foster mother:

> Q. And – so do you have any confidence, whatsoever, that this mother will be able to get this child to the doctor?
>
> A. I have a lot of concerns about it. So [do] I think she will initially do it? Yes. Do I think she can maintain? I think that is questionable.

Similarly, Ms. Vineyard, another caseworker, testified at trial that Mother has not been in regular attendance at the Child's medical appointments and as a result is not prepared to care for the Child:

> Q. Okay. And as far as the mother's actual involvement, what's your understanding of her involvement in those appointments?
>
> A. That she was not involved in the appointments, that she did not attend them.

Q. Was that concerning to you given the child's situation?

A. Yes.

Q. Why?

A. [U]ltimately, the goal was to hopefully get [Mother] ready to bring him home and have the knowledge and the skills that it would take to care for a child of his needs, and if she was not at these appointments, then she was not learning and … she wasn't going to be able to have the skills that she needed to properly care for him once he was home.

Q. And did you communicate that with the mother?

A. Yes.

Q. And did the mother appear to understand the importance of attendance at those meetings and appointments?

A. She did, but it seemed as though her idea of how important it was, or that it would be . . . continual care, I don't know how much of that she understood, that once he did come home, he would still need these continued services.

Mr. Williams testified that when he gave Mother a calendar on December 10, 2013, he also gave her a list of her son's upcoming medical appointments known at that time. He did not write the appointments in himself, but encouraged Mother to do so to help her stay informed. Ms. Vineyard testified that Mother never asked her when the Child's upcoming appointments would occur, checked in on the Child's health in general, or followed up to ask her questions about medical appointments she was unable to attend. Similarly, Ms. Daugherty, testified that she is "not very clear" on whether Mother "truly understands the needs of the child." Mother's testimony on August 21, 2014, indicated a lack of understanding about her son's medical needs. She was unable to recall many of the types of doctors her son saw, despite previously being given this information.

Mother's lack of follow through on efforts to manage her mental health raised doubts as to her ability to care for the Child and provide reliable management of the Child's health needs. Ms. Daugherty testified that "[Mother] is not receiving the mental health counseling or therapy that she needs because of her own failure to show up consistently at the appointments." The trial court found that Mother's participation in mental health services through Helen Ross McNabb "was sporadic, at best" and raised the following concerns:

What I have not been given an answer for is – is if she's not reliable enough to make these appointments and go to two or three in a row, if she is not reliable enough to hit more than three out of eight visitations, then how is she going to be reliable enough to take care of this child on her own out here. It's not a good bet for the Court, just not a good bet.

* * *

[T]he factor that speaks the loudest to me in this case is just one word[:] reliability. Have you done anything to prove to me that you could be a reliable, solid custodian for that child? . . . You have done a lot of things but I don't think you have affected a lasting adjustment because the mental health issue hasn't been completed and that is a huge issue for you.

Mother's mishandling of her own mental health care also raises concerns that her mental or emotional status would be detrimental to the Child or prevent her from providing safe and stable care and supervision. Based on the same evidence, the trial court found that Mother has not made such an adjustment of circumstance, conduct, or condition that it would be in the Child's best interest to be in her care. Given that the Child has been in custody for two years without Mother following through on a meaningful change for her mental health, the trial court saw this as evidence of her inability to make a lasting correction.

Evidence also indicates that Mother would struggle to provide a home that is healthy and safe, free of criminal activity and controlled substances. Mother tested positive for marijuana and benzodiazepine at a visit with the Child on January 30, 2014. When DCS asked Mother to submit to another drug test at her next visit with the Child on February 11, 2014, Mother refused, stating that she would test positive for marijuana. During the trial court's termination of parental rights hearing on October 16, 2014, the court asked Mother to submit to a drug test, which revealed that she tested positive for marijuana and benzodiazepines.

As stated in Section IV, Mother's inability to provide more than token visitation and inability to meet full support obligation would also weigh against the Mother in consideration of what is in the best interest for the Child.

Based on the above evidence, the trial court found by clear and convincing evidence that it is in the best interest of the Child to terminate Mother's parental rights. Namely, the trial court determined that Mother lacks the reliability necessary to meet the

Child's needs. The evidence does not preponderate against those findings of the trial court on the "best interest" issue.

## VI.

The evidence preponderates against the trial court's finding that Mother willfully failed to support the Child. Accordingly, the trial court's judgment is modified to eliminate the court's reliance on a failure to support. As modified, the trial court's judgment terminating Mother's parental rights to L.J., Jr. is affirmed. Costs on appeal are taxed to Mother. The case is remanded to the trial court for enforcement of the trial court's judgment as modified and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE