IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 3, 2024

## IN RE ROME W.

**Appeal from the Juvenile Court for Anderson County**
**Nos. J36029; J36030      Timothy G. Elrod, Judge**

_____

### No. E2024-00621-COA-R3-PT

_____

The juvenile court terminated a mother's parental rights to two of her children. The mother appealed and challenges the court's determination that clear and convincing evidence established grounds for termination and that termination of her rights was in the children's best interests. We find no error and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

L. Rosillo Mulligan, Harriman, Tennessee, for the appellant, Dawn W.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This case began in January 2020 when the Department of Children's Services ("DCS" or "the Department") received a referral alleging a lack of supervision of two children, Rome and Allie W., by their parents, Dawn W. ("Mother") and Jason W.[1] ("Father"). At this time, Rome was twelve years old, and Allie was eight years old. When a DCS investigator visited Mother's home, the investigator noticed that Allie had bruises on her face, which were attributed to a fight between Rome and Allie. Allie reported to the investigator that "she didn't want this happening again" and that this was not the Department's first time being involved with the family. The investigator also found that

_____
[1] Father is not a party to this appeal and will only be mentioned when necessary.

the family lived with a man known as "Uncle Karl," who was unrelated to the family but allowed them to live with him in exchange for Mother cooking. Upon further investigation, the investigator learned that Allie was unhappy in the home but did not want to be the reason the family was no longer together.

At a subsequent visit to the home, the investigator spoke with Mother and Father regarding the family's housing situation. The investigator noted that the home was very messy and that Uncle Karl slept on an air mattress in one of the upstairs rooms. The investigator then interviewed Uncle Karl, Rome, and two of Mother's and Father's older children, Logan and Jaxon, separately. The older children gave conflicting reports of where Uncle Karl actually slept in the house, and the investigator noted that, during the interviews, Uncle Karl repeatedly made excuses to enter the room and lingered outside the room during one of the interviews.

Later in the month, the investigator conducted additional interviews. Allie reported that Uncle Karl actually shared a room with Rome and that Mother and Father had told her not to tell anyone. In his interview, Rome reported that he wished to have his own room and that Uncle Karl would move over and hold him at night. Rome also reported that his parents had told him to tell anyone who asked that Uncle Karl slept in the upstairs room. The investigator then contacted the mother of Jaxon's girlfriend to ask her to bring the couple to the Department's office. The girlfriend's mother then told the investigator that Mother had told Jaxon not to speak to DCS. After the investigator confronted Mother, she admitted to lying regarding Uncle Karl's sleeping arrangement because they did not have sufficient room in the home. She also admitted that she had noticed Uncle Karl acting strangely around Rome. The investigator then interviewed Jaxon, who reported that Mother and Father drank heavily but that "they are getting better." Next, the investigator interviewed Jaxon's girlfriend, who stated that Mother and Father drank daily but that they were "happy drunks" and "you just get used to it." She also stated that Uncle Karl had previously thrown Jaxon against a door hard enough to leave a mark on his back and that Uncle Karl slept in the same room as Rome. The girlfriend's mother also reported several instances where she had been told of abuse by Mother, Father, and Uncle Karl against Jaxon.

The investigator then interviewed Mother and Father, who confirmed that one of the allegations of abuse had occurred. Mother reported that she had several medical issues and that "she [was] dying." After this, the investigator completed an immediate protection order with Mother, which mandated that there be no further contact with Uncle Karl and that the family stay in a hotel until DCS could find third-party placements for the children. The investigator later discovered that both parents had warrants for their arrest and then returned to Uncle Karl's home with police to arrest Mother and Father. Rome and Allie were placed with their maternal aunt until another placement could be found.

On February 4, 2020, DCS filed a petition seeking temporary legal custody of the children and alleging they were dependent and neglected. The juvenile court for Anderson County then entered an ex parte protective custody order, in which it found probable cause to believe that the children were dependent and neglected and that reasonable efforts had been made to prevent the children's removal. The court awarded custody of all four children to a family friend, Natalie H. The next day, DCS filed a motion for the court to enter an ex parte no-contact order against Mother and Uncle Karl, which the court granted. Mother later waived her right to a preliminary hearing, and the juvenile court scheduled a full hearing on the matter for May 14, 2020, and ordered Mother to pay child support in the amount of $50 per month per child. On the date of the scheduled hearing, Mother waived the adjudicatory hearing and stipulated that the children were dependent and neglected due to lack of supervision. The court found that it was reasonable for DCS to make no effort to keep the children in Mother's home and that they should remain with Natalie H.

On June 30, 2020, DCS received a referral alleging that Natalie H. was sexually abusing the children and allowing them to use drugs and alcohol. The following day, a DCS investigator met with the children and Natalie H. The children reported that Jaxon's girlfriend was facilitating contact with Mother in violation of the no-contact order. However, the children did not report that any sexual abuse had taken place. Two days later, Natalie H. contacted the DCS investigator and reported that caring for the children was too much for her to handle by herself. Thereafter, law enforcement contacted the investigator and reported that, during a traffic stop involving the children, an officer found three of them in the car with a "felony amount" of marijuana, which the children stated they planned to smoke. Because of these events, on July 9, 2020, DCS filed a petition to transfer legal custody of Rome and Allie to Stephanie C. The court then entered an order transferring custody and finding probable cause that the children were dependent and neglected. On October 1, 2020, Mother was granted visitation with Rome and Allie.

On July 6, 2021, DCS received another referral regarding Rome and Allie, which alleged that the two children were suffering from physical abuse and lack of supervision. A DCS investigator visited Stephanie C.'s home and found the children there alone. Rome and Allie were thirteen and nine, respectively, at this time. Rome disclosed that he had recently gotten in trouble for eating late at night and had been picked up and thrown into a cabinet, which caused him to lose consciousness. Allie's fingers were wrapped in electrical tape because she had cut her fingers while using a blender, and she stated that she only bathed once a week. When Stephanie C. returned home, she said she had recently taken Allie to the emergency room, where Allie needed stitches and had been referred to an orthopedic specialist. However, she had not taken Allie to the specialist because she did not know the child's social security number. A neighbor told the investigator that the children were often home alone and had previously asked for food. On July 14, 2021, DCS filed a petition for temporary legal custody of the children, which the court granted. A preliminary hearing was held on September 21, 2021, and the court again found probable

cause to believe the children were dependent and neglected and that reasonable efforts were made to prevent the children's removal. On November 2, 2021, the court adjudicated the children dependent and neglected, as alleged in the July 14 petition. The children were then removed from Stephanie C.'s care and placed in foster care, with Mother having visitation. The children have since remained in foster care.

Mother's behavior leading up to the termination hearing

After the Department's initial contact with Mother in 2020, she completed an assessment for alcohol use that noted she drank frequently and diagnosed her with alcohol use disorder of moderate severity. In July 2022, Mother tested positive for methamphetamine. The Department recommended Mother complete therapy and participate in a drug treatment program known as the "STOP" program. Mother began but did not finish the program and did not participate in therapy at all. On September 13, 2022, Mother completed an intake at Ridgeview Behavioral Health Services, where she reported that she experienced problems with alcohol, drug, or prescription medication use and that other people had expressed concern about her addiction issues. She also reported that she had been hospitalized for substance abuse and that she was currently without housing. After this intake, Mother continued to receive services from Ridgeview.

Near the end of September 2022, Mother was taken to an emergency room because she was having suicidal ideations and had overdosed on medication after drinking. In November 2022, Ridgeview entered a progress note stating that Mother had attempted suicide and had been arrested two weeks prior for traffic violations and a failure to appear charge. A week later, Ridgeview entered another progress note stating that Mother had been arrested for making a false report of a bomb threat.

Mother denied using any substances but, in November 2022, she had two drug screens return positive for substances while participating in the STOP program. The first test returned positive for alcohol, prescribed gabapentin,[2] and methamphetamine, and the second test returned positive for alcohol and gabapentin. On November 30, 2022, Mother completed a drug screen at Ridgeview that returned positive for alcohol and methamphetamine. On December 6, 2022, Ridgeview entered a progress note stating that Mother showed no signs of drug use but that her alcohol levels remained high.

Mother's substance abuse issues continued into the following year. On January 26, 2023, Mother admitted to testing positive for marijuana on a DCS drug screen the previous week. After Mother was arrested for driving under the influence in March 2023, DCS

---

[2] Gabapentin is prescribed "to prevent and control partial seizures, relieve postherpetic neuralgia after shingles and moderate-to-severe restless legs syndrome." *Gabapentin*, CLEVELAND CLINIC (July 1, 2021), https://my.clevelandclinic.org/health/drugs/21561-gabapentin.

- 4 -

required her to attend more intensive treatments. In October 2023, DCS asked Mother to complete a hair follicle drug screen by the end of the month. Mother claimed to have completed it, but the provider reported to DCS that it had no record of Mother completing the drug screen. At a meeting with DCS on November 30, 2023, Mother reported that she had stage-four lymphoma and was taking multiple medications as treatment. She also reported that she was unable to work. The Department asked Mother for documentation regarding her health, but she never provided anything.

On March 16, 2023, DCS filed a petition in the juvenile court for Anderson County seeking to terminate both parent's rights to Rome and Allie, and a hearing on the matter was scheduled for August 10, 2023. The hearing was rescheduled several times, however, and eventually took place almost a year later on February 1, 2024.[3] Mother did not attend the hearing but was represented by counsel. When questioned about why Mother was not present, her attorney responded that Mother indicated that she had undergone chemotherapy treatment two days prior and had another treatment scheduled for shortly after the hearing. Mother's counsel also candidly stated that, as the court was aware, Mother had several outstanding warrants and she assumed Mother was "not here because she ha[d] chosen to–I guess not be a guest of the State, but I don't know." The court then determined that Mother was properly served with the petition and had notice of the hearing date. The court then stated, "So any continuance for her, although not asked for, even if asked for, is denied."

The proof presented by DCS included testimony by Kristin Timmons, Mother's former DCS case manager; Missy Rutherford, a supervisor overseeing her case; a notebook created by DCS that documented Mother's history; copies of Mother's health records from various treatment facilities; and certified copies of Mother's arrests. At the close of proof, the court found that DCS had proven by clear and convincing evidence the grounds of substantial noncompliance with the permanency plans, wanton disregard, and failure to assume custody of or financial responsibility for the children. The court also found that it was in the children's best interests to terminate Mother's parental rights. A final order reflecting the court's findings and terminating Mother's rights was entered on March 27, 2024.

Mother timely appealed and presents the following issues, which we quote from her brief, for our review:

I. Whether governmental action in this case satisfied the due process requirement of "fundamental fairness" and the rigid standard of proof of clear and convincing evidence?

---

[3] Father was granted a continuance at the beginning of the hearing, and the hearing proceeded only as to Mother.

II. Whether the evidence presented was of sufficient quality and substantiality to support the rationality of the TPR judgment?
III. Whether the lower court committed error by denying respondent's ore tenus motion for a continuance of the TPR trial on an unrefuted statement from the parent's counsel that the respondent/mother was undergoing cancer treatment at the time of trial?
IV. Whether DCS made reasonable efforts to assist the respondent/mother in addressing the primary issue(s) that brought the children into DCS custody?

The Department presents the additional issues of (1) whether the juvenile court properly determined that grounds existed to terminate Mother's parental rights and (2) whether the juvenile court properly determined that the termination of Mother's parental rights was in the children's best interests.

STANDARD OF REVIEW

Our Supreme Court has found "that both the United States and Tennessee Constitutions protect parents' rights to the custody and care of their children." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This interest has been said to be "'far more precious than any property right.'" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). Although this right is fundamental, parents may forfeit it by conducting themselves in ways that substantially harm their children. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). Before a court terminates a parent's rights to a child, it must be shown that the parent is unfit or that the child will suffer substantial harm if the parent's rights are not terminated. *In re Adoption of A.M.H.*, 215 S.W.3d at 809 (citing *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)). The Tennessee legislature has established the methods and procedures by which parental rights may be terminated. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Petitioners must show clear and convincing evidence that at least one of the enumerated grounds found in the statute exists and that terminating the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). On appeal, reviewing courts must determine on their own accord whether the facts, "either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

We review findings of fact de novo upon the record with a presumption of correctness unless the preponderance of the evidence indicates otherwise. TENN. R. APP. P. 13(d); *In re Bernard T*, 319 S.W.3d 586, 596 (Tenn. 2010). The petitioner must prove both steps of the termination process by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d at 250. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo

with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

ANALYSIS

I.      The court's denial of a continuance

We begin with Mother's contention that the juvenile court erred when it ruled that a continuance, even if requested, would be denied.[4] The record does not indicate that Mother actually made a motion for a continuance. Instead, the court preemptively denied any request for a continuance Mother's attorney may have made. However, because the juvenile court ruled as if Mother had requested a continuance and both parties briefed this issue, we will address whether the court correctly denied Mother a continuance.

We review a denial of a continuance under the abuse of discretion standard of review. *In re A'Mari B.*, 358 S.W.3d 204, 213 (Tenn. Ct. App. 2011). An abuse of discretion will be found when the trial court "causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher* 312 S.W.3d 515, 524 (Tenn. 2010). The underlying factual findings are reviewed using the preponderance of the evidence standard found in Tenn. R. App. P. 13(d), and legal conclusions are reviewed de novo with no presumption of correctness. *Id.* at 525.

We have previously discussed the factors to be considered when reviewing a court's decision to grant or deny a continuance:

_____

[4] Much of Mother's argument regarding this issue consists of speculative and unsupported statements about whether her proceeding was fundamentally fair. Mother failed to brief this issue appropriately. She relies on two United States Supreme Court decisions for broad propositions regarding the fairness of proceedings, but she fails to point to anything in the record showing that the termination proceeding was fundamentally unfair, and this Court's review of the record revealed nothing suggesting the proceeding was fundamentally unfair. It appears that Mother's argument here is that termination proceedings, in general, are fundamentally unfair. For example, Mother argues that termination proceedings are unfair because DCS has more financial resources than an indigent parent with appointed counsel. Mother asserts, hypothetically, that she would not have been able to afford an expert witness while DCS would have been able to hire an expert witness. Mother also asserts that "TPR proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge." The court in Mother's case terminated her parental rights using the clear and convincing evidence standard, not the judge's subjective values. Our Supreme Court's decisions have repeatedly stated that the requirement of "[c]lear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. Moreover, our Supreme Court has held that termination proceedings are fundamentally fair because our state's "court rules, statutes, and decisional law are already replete with procedures . . . designed to ensure that parents receive fundamentally fair parental termination proceedings." *Id.* at 533. We find no merit in Mother's arguments.

The party seeking a continuance bears the burden of establishing the circumstances that justify the continuance. *Osagie v. Peakload Temp. Servs.*, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002). Decisions regarding the grant or denial of a continuance are fact-specific and "should be viewed in the context of all the circumstances existing" at the time of the request. *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). The circumstances include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id.* (footnotes omitted)

*In re Paetyn M.*, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at *5 (Tenn. Ct. App. Feb. 14, 2019).

In support of her argument that the court abused its discretion by not granting a continuance, Mother asserts that DCS was aware of her cancer diagnosis and that "the court should have considered the entire record and the prejudice to [Mother] in denying her a continuance." Mother then asserts that the denial of a continuance violated Mother's due process rights. Respectfully, Mother's argument fails for several reasons. First, Mother's assertion that DCS knew of her diagnosis impermissibly shifts the burden of seeking a continuance onto DCS. Next, while it appears that Mother did not prolong the case, she also failed to show diligence in seeking a continuance and, it appears, failed to have her attorney seek a continuance despite knowing of her medical appointments. Finally, Mother was not denied due process. She was properly served with the termination petition and had notice of the hearing. Further, she was represented by counsel throughout the hearing. Any potential prejudice to Mother was the result of her own actions. Therefore, Mother has failed to show that the court abused its discretion.

II.    Grounds for termination

Having determined that the court did not abuse its discretion by denying a continuance, we turn next to whether clear and convincing evidence established the existence of the three grounds for termination. Although Mother's brief does not address any of the termination grounds found by the trial court specifically, we are cognizant of our Supreme Court's directive in *In re Carrington H.*, and we will address each of the grounds for termination individually. 483 S.W.3d at 525-26 ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

a. Substantial noncompliance with permanency plans

The juvenile court terminated Mother's rights according to Tenn. Code Ann. § 36-1-113(g)(2). This ground allows for termination of a parent's rights when "there has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." *Id.*

To establish this ground for termination, DCS must demonstrate both "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody" and "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Minor deviations from a permanency plan's requirements are insufficient to establish this ground. *Id.* However, parents are required to "put in real effort to complete the requirements of the plan in a meaningful way" in order to be in a position to be responsible for the children. *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006).

After the children were removed from Mother's care, DCS developed three permanency plans that were all ratified by the juvenile court. Mother participated in creating the first plan and was present at the September 21, 2021, hearing entering the plan. As the juvenile court found, all three plans listed the same requirements for Mother:

> Obtain and maintain safe and appropriate housing, legal income, and reliable transportation or a transportation plan; submit to an alcohol and drug assessment and follow all recommendations; submit to a mental health assessment and follow all recommendations; sign releases of information to allow DCS to verify compliance with all services; submit to and pass random drug screens, including oral, urine, hair follicle, and nail bed drug tests; schedule and maintain consistent visitation with the children; maintain consistent communication with DCS and attend all meetings and court proceedings; abide by all state and federal laws; regularly pay child support; complete a parenting assessment and follow all recommendations; actively participate in family therapy as the child's therapist deems appropriate and follow all recommendations; enroll in and complete domestic violence education; and provide proof of completion of the services requested.

Although the trial court's final order notes that the juvenile court previously found these requirements reasonable and related to the conditions necessitating the children's placement in foster care, the trial court failed to make its own findings concerning the permanency plan's requirements. Orders ratifying a permanency plan are not final orders, and a court making a termination decision on the ground of substantial noncompliance must make a finding that the permanency plan's requirements were reasonable and related

to the conditions necessitating foster placement. *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). When a court has failed to do so, our review of the issue is de novo. *Id.* We have reviewed the record and the plan's requirements for Mother and find they are reasonable and related to why the children were removed from her care. Among the reasons the children were removed from Mother's care were her inability to supervise the children, lack of stable housing, substance abuse issues, domestic violence issues, and criminal behavior resulting in her arrest. The responsibilities outlined in the plan are all related to Mother's parenting abilities, substance abuse, relationship with the children, housing and financial instability, domestic violence, and criminal behavior. Thus, this requirement was satisfied.

The second requirement DCS must prove to establish this ground is that the parent's noncompliance is substantial. *In re M.J.B.*, 140 S.W.3d at 656. When evaluating whether a parent's noncompliance is substantial, we measure "the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. The juvenile court found that Mother had not substantially complied with the responsibilities listed in the plan. The court noted times in 2021 when it appeared that Mother was progressing toward completing the plan's requirements but then found that, by 2022, Mother was regressing. In November 2022, Mother tested positive for alcohol and gabapentin and, in December 2022, Mother was arrested for criminal trespass and stated that she was no longer employed. She also admitted to drinking again at this time. In January 2023, Mother tested positive for marijuana. The evidence submitted at trial supports the court's conclusion that Mother failed substantially to comply with the plan's responsibilities. She continued to abuse drugs and alcohol and failed to refrain from engaging in criminal behavior. Mother also failed to provide proof of legal income to DCS or have consistent transportation or a transportation plan. She failed to visit or support the children as required and failed to implement any of the recommendations from the addiction treatment programs or domestic violence education programs she attended.

Importantly, Mother failed to maintain stable housing. The Department became involved with the family because of their housing arrangement with Uncle Karl and the dangers this posed to the children. Since that time, Mother has lived in various places, including a one-bedroom apartment with a young friend of her son and a studio apartment with a man whom DCS believed physically abused her. The Department noted that this apartment was cluttered with dirty clothes, dishes, and open food items. Mother admitted to DCS that the apartment would not be suitable for the children. Mother reported leaving this apartment in February 2023, and it was unknown where Mother was residing at the time of the trial. Mother argues on appeal that the record does not contain clear and convincing evidence because Ms. Timmons's testimony contained "I believe" statements. For example, Ms. Timmons stated that she "believed" that Mother had continued to engage in criminal behavior. As Mother's former case manager, Ms. Timmons could provide the court with relevant opinions, and the trial court was entitled to hear and assess the credibility of her statements. Moreover, the court based its decision on more than just Ms.

Timmons's testimony. The record also contains certified copies of Mother's arrests, a DCS notebook contemporaneously documenting its interactions with Mother, and copies of Mother's medical records at the various drug and alcohol treatment facilities at which Mother sought treatment. Therefore, we find her argument to be meritless.

Based on the foregoing, we conclude that DCS established this ground by clear and convincing evidence.[5]

### b. Wanton disregard

We turn next to the juvenile court's determination that Mother abandoned the children under Tenn. Code Ann. § 36-1-113(g)(1). In the context of parental termination, the legislature has provided several definitions of "abandonment." The definition applicable here is found in Tenn. Code Ann. § 36-1-102(1)(A)(iv), and it provides, in pertinent part, as follows:

> [A] parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
> . . .
> (*c*) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard of the child[.]

The termination petition in this case was filed on March 16, 2023. This means the relevant four-month period Mother must have been incarcerated during was November 16, 2022, to March 15, 2023.[6] Proof introduced at trial showed that Mother was arrested and incarcerated for criminal trespass on December 12, 2022. The first part of the statute, therefore, was satisfied.

The statute does not define the term "wanton disregard." However,

> Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide

---

[5] Mother argues that DCS failed to make reasonable efforts regarding the permanency plans. Respectfully, Mother misunderstands the law on this issue. A petitioner seeking to terminate a parent's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2) need not put on proof of DCS's reasonable efforts. *In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *5 (Tenn. Ct. App. Apr. 20, 2023). Indeed, the only termination ground requiring proof of DCS's reasonable efforts is the ground for abandonment by failure to provide a suitable home. *Id.* The Department's efforts, instead, are one of the factors to be considered in the best interest analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)(L); *In re Kaliyah S.*, 455 S.W.3d 533, 555-56 (Tenn. 2015).

[6] Mother argues that her arrests and incarceration did not fall into the four-month window. However, Mother incorrectly calculates the period as beginning on December 16, 2023.

adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68; *see also In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse."); *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005) (quoting *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005)) ("[A]n incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child.")

*In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *2 (Tenn. Ct. App. June 9, 2015). When examining a parent's conduct to determine whether he or she demonstrated a wanton disregard, a court is not limited to considering only the conduct occurring during the four months immediately preceding the filing of the petition. *In re Audrey S.*, 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005).

The court found that Mother had exhibited a wanton disregard for the children by failing to provide safe and appropriate care for the children and had exposed them to alcohol abuse, domestic violence, criminal activity, her incarceration, and inappropriate supervision. The court also noted that Mother has continued to use substances, including alcohol, THC, and methamphetamine. She has continued to use drugs and alcohol, engaged in criminal behavior, and failed to attain safe and stable housing for the children. We, therefore, conclude that the trial court properly determined that DCS established this termination ground by clear and convincing evidence.

c. Ability and willingness to assume custody

Finally, the court terminated Mother's rights based upon a finding that clear and convincing evidence showed that Mother had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the children. *See* Tenn. Code Ann. § 36-1-113(g)(14). To establish this ground, two elements must be proven by clear and convincing evidence: (1) the parent has failed to manifest an ability or willingness to assume custody of or financial responsibility for the child, and (2) returning the child to the parent's custody creates "a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). Evidence of a failure to manifest either an ability or a willingness is sufficient for the first element. *Id.* at 677. The risk of harm under the second element must be real and not "minor, trivial, or insignificant." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). The harm must be more than theoretical but does not need to be inevitable. *Id.* All that is necessary

is that the harm "be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Id.*

Willingness is shown "by attempting to overcome the obstacles that prevent [parents] from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019). "Ability focuses on the parent's lifestyle and circumstances." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). Mother argues that DCS failed to establish this ground because she had attempted to overcome the obstacles preventing her from assuming custody of the children. We agree that early in this case, Mother appeared to be attempting to overcome the obstacles in her life. However, as the case progressed, she ceased doing so. When looking at her lifestyle and circumstances, Mother had not overcome her substance abuse issues, resulting in an overdose in September 2022. She failed to maintain stable housing or sources of income. She also ceased maintaining her visitation with the children and continued engaging in criminal behavior. Mother's untreated substance abuse, lack of appropriate housing, continued criminal behavior, lack of a source of legal income, and failure to maintain consistent visitation all established Mother's inability to assume custody and financial responsibility for the children.

We next turn to the second element of the statute, whether placing the children with Mother would pose a risk of substantial physical or psychological harm to the children. We conclude that placing the children with Mother would pose this risk. We have recently stated that "placing a child with a parent who engaged in repeated criminal conduct that required incarceration would put a child at risk of substantial physical or psychological harm." *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021). We also stated that "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm." *Id.*

Unfortunately, Mother has many of these conditions present in her life. Mother had a significant history of drug and alcohol addiction, which she failed to overcome. Mother admitted to keeping alcohol in her possession to "test her willpower" and failed to complete the most recent treatment for addiction. Significantly, placing the children in Mother's custody would pose a significant risk to their safety because of the presence of Douglas R., who has physically abused Mother on several occasions. The abuse was significant enough for Mother to ask DCS to ask her to come in for a drug screen to attempt to escape from him. Sadly, Mother did not use this opportunity to escape from him and instead left with him after not using the domestic violence resources made available to her. Though Mother recently told DCS she had left his apartment, her history of returning to him after abuse casts doubt on whether this is sufficiently true to mitigate any risk of harm to the children. Finally, placing the children in Mother's custody poses a substantial risk to them because

of Mother's continued criminal activity. We conclude that clear and convincing evidence established this ground.

### III.     Best interests analysis

Once a court has found the existence of at least one ground for termination, the petitioner must next prove by clear and convincing evidence that termination is in the children's best interests. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). This determination is entirely separate from the determination regarding the existence of grounds for termination. *In re Angela E.*, 303 S.W.3d at 254. Once a ground for termination has been proven by clear and convincing evidence, the interests of the children and the parents diverge, and the court focuses squarely on the children's best interests. *In re Audrey S.*, 182 S.W.3d at 877. Facts to be considered at this stage must be proven by a preponderance of the evidence, and the combined weight of these facts must be sufficient to show clear and convincing evidence that termination is in the children's best interests. *In re Kaliyah S.*, 455 S.W.3d at 555. If the interests of the parent and the children conflict, courts resolve the conflict in favor of the rights and best interests of the child. Tenn. Code Ann. § 36-1-101(d). Further, we are to evaluate whether termination is in the child's best interests from the child's perspective, not the parent's. *White*, 171 S.W.3d at 194.

When undertaking a best interests analysis, courts must consider a non-exhaustive list of statutory factors.[7] *See* Tenn. Code Ann. § 36-1-113(i); *In re Dakota C.R.*, 404 S.W.3d 484, 503 (Tenn. Ct. App. 2012). Courts are not required to find the existence of each factor before determining that termination is in the children's best interests. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). In certain circumstances, the consideration of a single factor may be outcome-determinative. *In re Audrey S.*, 182 S.W.3d at 878. However, even if one factor is outcome-determinant, courts have a duty to consider every factor and all relevant proof that a party offers. *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). The best interests analysis must be a "factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated." *Id.*

The first statutory factor, factor (A), directs courts to consider "[t]he effect a termination of parental rights will have on the child[ren]'s critical need for stability and continuity of placement throughout the child[ren]'s minority." Tenn. Code Ann. § 36-1-113(i)(1)(A). The termination of Mother's parental rights will positively impact the children's need for stability and continuity of placement. The children had been out of Mother's care for four years by the time the termination hearing occurred, and she entered

---

[7] In her brief, Mother cites to a previous version of the best interest factors. The best interest factors were amended in 2021. *See* 2021 TENN. PUB. ACTS., chapter 190, section 1, effective April 22, 2021. As the petition to terminate Mother's rights was filed on March 16, 2023, the amended best interest factors are applicable here.

and left their lives repeatedly throughout that time. Termination of Mother's parental rights will also allow DCS to engage in further efforts to find permanent placements for the children, and the children have told DCS they hope to be adopted. Termination of Mother's parental rights to the children is unlikely to impact their relationships with one another as they have consistently been placed in the same placements together. The children also have no significant relationships with Mother's extended family. *See id.* § 36-1-113(i)(1)(I) ("Whether the child[ren] ha[ve] emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child[ren]'s access to information about the child[ren]'s heritage."). Placing the children in Mother's home would hurt the children's emotional and psychological conditions due to their expressed desire to no longer communicate with Mother because, when the children spoke with Mother, she showed them pictures of men she wanted to date and made them feel uncomfortable. *See id.* § 36-1-113(i)(1)(B) ("The effect a change of caretakers and physical environment is likely to have on the child[ren]'s emotional, psychological, and medical condition[s].").

Mother had not demonstrated any continuity or stability in meeting the children's needs. At the time of trial, Mother had several outstanding warrants for her arrest, which likely prevented her from attending the trial and would prevent her from being a stable presence in the children's lives. Similarly, Mother failed to obtain stable housing, instead living in various inappropriate homes, including various hotels and a home with a man who physically abused her. *See id.* § 36-1-113(i)(1)(C) ("Whether the parent has demonstrated continuity and stability in meeting the child[ren]'s basic material, educational, housing, and safety needs."). The children do not have strong relationships with Mother because she failed to maintain consistent visitation with the children. Indeed, the children expressed a desire to no longer see her, though the children apparently expressed willingness to do so prior to the trial. The evidence at trial showed that it was unlikely that Mother would be able to create a healthy parental attachment to the children. Mother showed through her behavior at visitations (showing the children pictures of men she wanted to date) that she was unable to create a healthy parental attachment with the children. *See id.* § 36-1-113(i)(1)(D), (E) ("Whether the parent and child[ren] have [] secure and healthy parental attachment[s], and if not, whether there is a reasonable expectation that the parent can create such attachment[s]" and "[w]hether the parent has maintained regular visitation or other contact with the child[ren] and used the visitation or other contact to cultivate a positive relationship with the child[ren].").

Mother failed to provide the children with a safe and stable environment. This failure dates back to when Mother and the children stayed with Uncle Karl, a man Mother later admitted she believed had been molesting Rome. Also, at Uncle Karl's home, a lack of supervision resulted in Allie being injured because the children fought one another. Indeed, DCS first became involved with the family because the children were not being adequately supervised. Mother's criminal activity, including substance use, also prevented

her from providing safe and stable care for the children. Mother did not demonstrate that she possessed an understanding of the children's basic and specific needs such that she could create a suitable home for them. *See id.* § 36-1-113(i)(1)(O), (P), (Q) ("Whether the parent has ever provided safe and stable care for the child[ren] or any other child," "[w]hether the parent has demonstrated an understanding of the basic and specific needs required for the child[ren] to thrive," and "[w]hether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child[ren]'s basic and specific needs.").

Mother's physical environment would be unsafe for the children because she failed to obtain stable housing, and any housing she did find was unsuitable for the children, a fact Mother admitted. *See id.* § 36-1-113(i)(1)(R) ("Whether the physical environment of the parent's home is healthy and safe for the child[ren]."). Mother showed neglect to the children by exposing them to domestic violence, sexual abuse by third parties, unstable housing, and substance abuse while in her care. *See id.* § 36-1-113(i)(1)(N) ("Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child[ren] or any other child or adult."). Mother failed to provide consistent financial support for the children throughout their time in DCS's custody. *See id.* § 36-1-113(i)(1)(S) ("Whether the parent has consistently provided more than token financial support for the child[ren].").

Mother also lacked the mental and emotional fitness necessary to parent the children by failing to implement the recommendations from the various programs she underwent throughout the children's time in DCS's custody. Mother did not meaningfully address her substance abuse problems, mental health needs, or history of domestic violence. Mother was also arrested multiple times since the children's removal from her care. Therefore, Mother's mental and emotional fitness would be detrimental to the children and would prevent her from providing safe and stable care and supervision for the children. *See id.* § 36-1-113(i)(1)(T) ("Whether the mental or emotional fitness of the parent would be detrimental to the child[ren] or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child[ren].").

Regarding factor (J), Mother failed to demonstrate a lasting adjustment of circumstances, conduct, or conditions to make it safe for the children to be in her custody. There was repeated criminal activity in the home, and Mother continued to use drugs and alcohol. *See id.* § 36-1-113(i)(1)(J) ("Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child[ren] to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child[ren] in a safe and stable manner.").

Mother also failed to take advantage of available programs, services, or community resources to assist her in making a lasting change of circumstances. The Department referred Mother to numerous resources to address domestic violence, substance abuse, mental health, housing, and transportation. Through these referrals, DCS made reasonable efforts to assist Mother in making a lasting change of her circumstances. *See id.* § 36-1-113(i)(1)(K), (L) ("Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions," and "[w]hether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child[ren] [are] in the custody of the department."). By failing to take advantage of these programs, Mother has failed to show any sense of urgency in addressing the issues that necessitated the children being removed from her care. She also lacked any sense of urgency to regain custody of the children during their time in foster care. *See id.* § 36-1-113(i)(1)(M) ("Whether the parent has demonstrated a sense of urgency . . . seeking custody of the child[ren], or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child[ren]'s best interest[s].").

We find the remaining factors to be inapplicable to this case. Therefore, based on the combined weight of the individual facts of this case, we conclude that DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the best interests of the children.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Dawn W., for which execution may issue if necessary.


/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

- 17 -